[Civ. No. 35649. Second Dist., Div. Five. Jan. 29, 1971.]

ACOUSTICS, INC., Plaintiff, Cross-defendant and Appellant, v.
TREPTE CONSTRUCTION CO., INC.,
Defendant, Cross-complainant and Appellant;
STEINY & MITCHELL, INC.,
Defendant, Cross-complainant, Cross-defendant and Appellant;
GENERAL INSURANCE COMPANY OF AMERICA,
Defendant and Appellant;
STATE DEPARTMENT OF PUBLIC WORKS,
Defendant, Cross-defendant and Appellant.

888

## COUNSEL

Ernest Duncan for Plaintiff, Cross-defendant and Appellant.

Anderson, McPharlin & Conners and Ernest Duncan for Defendant, Cross-complainant and Appellant.

Booth, Mitchel, Strange & Willian for Defendant, Cross-complainant, Cross-defendant and Appellant and for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Sanford N. Gruskin and Howard J. Schwab, Deputy Attorneys General, for Defendant, Cross-defendant and Appellant.

## OPINION

### FRAMPTON, J.*—

*Statement of the Case*

On April 9, 1964, plaintiff Acoustics, Inc. (hereafter Acoustics) filed its complaint in action number 836618, upon a stop notice and performance bond, against defendants Trepte Construction Co., Inc. (hereafter Trepte), Reliance Insurance Company, a corporation, Planet Insurance Company, a corporation, and the Department of Public Works of the State of California (hereafter State). Acoustics sought payment for the reasonable value of claimed extra work and materials furnished Trepte in connection with the construction of a classroom building on the campus of San Fernando Valley State College, Northridge, California, under a subcontract with Trepte. Trepte cross-complained against Steiny & Mitchell, Inc. (hereafter Steiny), and State, for a sum equal to any judgment rendered in favor of Acoustics against Trepte on Acoustics' complaint on the stop notice and performance bond.

On April 29, 1964, Acoustics filed its action number 837741 against Steiny, General Insurance Company of America (hereafter General), and State, on the stop notice and performance bond, seeking recovery for the reasonable value of labor and materials claimed to have been furnished Steiny. This action involves the same controversy over the labor and materials claimed to have been furnished in action number 836618. Steiny cross-complained against Acoustics in this action claiming general and punitive damages for the alleged wrongful filing of the stop notice by Acoustics pursuant to section 1192.1, Code of Civil Procedure, thereby directing State to withhold funds due Steiny.

The two foregoing actions were consolidated for trial and were tried as consolidated actions.

On February 26, 1969, judgment was entered on the complaint in action number 836618 in favor of Acoustics and against Trepte in the sum of

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

$7,000. On the cross-complaint, judgment was entered in favor of Trepte and against State in the sum of $7,000, and in favor of Steiny and against Trepte. On the same date, in action number 837741, judgment was entered in favor of Steiny and General, and against Acoustics including an award of costs of $1,500 attorneys' fees to Steiny and $100 attorneys' fees to General, allowed upon a motion to tax costs. Motion of Acoustics to set aside the judgment and enter another and different judgment was denied.

State appeals from the judgment against it and in favor of Trepte. Trepte appeals from the judgment against it and in favor of Steiny. Steiny, General and Acoustics appeal from the minute order taxing costs.

### Statement of Facts

Because of the claim of gross error on the part of the State Architect in denying the claim for extra work, it will be necessary to set forth the facts of the controversy in some detail.

On October 31, 1961, State and Trepte entered into a written contract wherein Trepte agreed to furnish all labor, materials and equipment to construct and complete the General Work for Classroom Building No. 1, San Fernando Valley State College, Northridge, California. On November 1, 1961, State and Steiny entered into a written contract wherein Steiny agreed to furnish all labor, materials and equipment to construct and complete the electrical work on the project. The construction project was to be accomplished in accordance with the plans and specifications referred to in the respective contracts.

Trepte entered into a written subcontract with Acoustics whereby Acoustics agreed to perform a certain portion of the work called for in the plans and specifications for general work.

Trepte alleged in its pleadings that, according to the plans and specifications, Steiny was required to lay out the location of the recessed lighting fixtures which were to be installed in the mechanically suspended acoustic tile ceiling and had failed to do so; also, that, according to the plans and specifications, Steiny was required to provide support for the lighting fixtures which were to be installed in the mechanically suspended acoustic tile ceiling and had failed to do so. Trepte further alleged that due to Steiny's failure to perform the above mentioned work, Trepte's subcontractor, Acoustics, was required to accomplish the work and that Acoustics claimed such work to be extra work. State denied the allegations.

Trepte also alleged that it filed a claim with the State Architect, and thereafter with the State Board of Control, for extra compensation for the

work and materials allegedly furnished to State in laying out and supporting the light fixtures in the acoustic tile suspended ceiling, contending that this work was not required by the contract between the State and Trepte and was therefore extra, and that such claim was denied.

The State admitted the filing and the denial of the claim, and alleged that Article 51 of the General Conditions of the contract barred Trepte's claim and subsequent cause of action. In an amendment to the cross-complaint, Trepte alleged that the State Architect and the State Board of Control were in gross error, that they were not impartial and did not exercise honest judgment in denying Trepte's claim, as their decision was contrary to the governing plans and specifications, and to customs of the building trade.

The General Requirements and Special Conditions in the contracts of both prime contractors, Trepte and Steiny, contain the following language bearing upon the responsibility of the contractors for laying out and co-ordinating the work of the different prime contractors:

"1A-05 b. Laying out Work: The General Work Contractor shall lay out his work and shall establish necessary markers, bench marks, batter boards and stakes, and shall be responsible for the accuracy of same. He shall lay out on the forms, walls, flooring, etc., the exact location of all partitions as a guide to all trades and to other contractors.

"Other prime contractors will lay out their portions of the work, establishing all required lines and levels, etc., from the elevations and markers indicated.

"1A-06. Coordination of Segregated Contracts.

"a. Coordination of Work: When the work of this project is segregated into several separate prime contracts, each prime contractor shall cooperate with the other prime contractors in the use of existing or temporary facilities and shall adjust his operations as directed to obtain harmonious relations and uninterrupted progress.

"b. Procedures and Responsibilities: The General Work Contractor shall notify all other prime contractors when they may install or make preparation for their work, and shall permit them all reasonable facilities for so doing. Each prime contractor is responsible for the correct location of anchorages, holes, and the like, for his work. When it is required that anchorages or preparations in the structure must be made for any of the Mechanical or Electrical or other prime contractors, then the General Work Contractor shall perform or make the necessary preparation as a part of his work. In case the General Work Contractor is not notified to make preparation at the proper time, resulting in extra work in cutting out or

patching, then the other prime contractor shall be responsible and shall reimburse the General Work Contractor for any costs involved. Such cutting or patching shall not be performed by any other prime contractor without the General Work Contractor's consent and approval."

The General Requirements and Special Conditions of the contracts of each prime contractor were also identical. The pertinent portions of these General Conditions are section 4, which sets forth the instructions to bidders; section 29, which sets forth the method of interpretation of the Plans and Specifications; section 40, which sets forth the procedure to be followed if a dispute arises between the State and a contractor regarding contract requirements; section 42, dealing with work change orders, and section 51, which sets forth the procedure for final payment to the contractor and the method of making a claim against the State for additional money.

Those portions of the General Work contract which relate to the support of the recessed light fixtures to be installed in the acoustic tile suspended ceiling are found in section 8, part K, Acoustic Tile. This section provides in part:

"8K-01. Scope: Furnish and install acoustic tile including suspension system shown or specified. Suspension system for plaster-backed acoustic tile ceilings and plaster backing is specified under section 9.

"8K-04 g. Suspension system for No. 7 mounting shall be furnished and installed complete by this contractor. Cold-rolled carrying channels of 1½ inch shall be spaced at not over 4 ft. o.c. with a run not more than 6 inches from each paralleling wall, and shall be hung by No. 9 wire, strap hangers or rods. Main runners shall be either concealed Z-bars, T-bars, or H-bars, attached to carrying channels by suitable clips. Main runners shall be fabricated from not less than 24 gauge cold-rolled zinc bond steel. Installation shall be in strict accordance with recommendations of the manufacturer of the suspension system used.

"Attention is called to General Note No. 10 on sheet 1.

"8K-05. Installation.

"a. Workmanship: Installation shall not start until building is fully enclosed and all 'wet' operations completed. Tile shall not be installed under high humidity or low temperature conditions. Tile units shall be placed symmetrically about center lines of rooms. Cut units shall occur only at walls and ceiling openings. Joints shall be true and straight, and junctures with ceilings, walls, and openings shall be neat and tight. Completed tile work shall present a smooth, plane, and level (or plumb) surface, free from unevenness, edge or corner offsets, cupping, scratches and other imperfec-

tions. Work shall be coordinated with work of other trades in providing openings, such as lighting fixtures, ventilating fixtures, and others. Where recessed lighting fixtures occur, tile shall be installed with regard to ceiling pattern formed by light fixtures. Before installation is started, work by others upon which tile is to be mounted or secured shall be inspected to ascertain that such work is satisfactory for receipt of tile; start of installation shall imply that such is the case."

The relevant portions of the electrical work plans and specifications are found in sections 2E-49 and 3E-54, which provide in part as follows:

"2E-49. Lighting Fixtures.

"a. General: The contractor shall furnish and install all lighting fixtures as shown on the electrical drawings and as specified herein and in subsequent sections. Fixture design is shown at each fixture outlet on the electrical drawings, and this contractor shall be responsible for the complete equipment of all fixture outlets with fixtures of proper design. Architectural drawings shall be consulted for necessary details of exact mounting methods and location, where required.

"d. Installation.

"1. Continuous runs of fixtures shall be installed straight and true and shall be equipped with all necessary parts such as joining straps, couplings, nipples, etc., for complete and workable units. All recessed fixtures shall be installed using supporting brackets, grounds, plaster rings, etc., as recommended by the fixture manufacturer. All supports for fixtures shall be furnished by this Contractor. All stem lengths shall be adjusted to meet conditions. Mounting heights to bottom of fixture are given as accurately as possible.

"3E-54:

"6. Recessed fixtures shall be equipped with the proper frames and supports as required by the particular type of ceiling construction. Catalog numbers do not indicate the type of ceiling construction or hangers, but fixture type only.

"8. Fixtures installed on acoustical ceilings shall be installed with the center line of the fixtures on the center line of the tiles, or on a joint between adjacent tiles as best suits the fixture spacing. This also shall apply to the outlet boxes."

Howard C. Smith, called as a witness on behalf of Acoustics, testified that he was the vice-president and general manager of Acoustics during the years 1961, 1962, and 1963. He was president of the corporation at the

time he testified at the trial; since 1948 he had worked in various capacities for acoustic ceiling contractors; during that period he had experience in developing specifications for the industry; he worked with the plans and specifications on Classroom Building No. 1 at San Fernando Valley State College, particularly those dealing with the acoustic tile suspended ceilings and other portions which related to the acoustic ceiling work; the plans and specifications, in his opinion, required that the electrical fixtures be supported independently by the electrical contractor; it was the custom and usage in the industry that unless the plans and specifications specifically provided for framing and support for lighting fixtures to be provided by the acoustic tile contractor, such contractor would not provide such support; the plans and specifications required Acoustics to coordinate its work with that of the other trades, and Acoustics' only layout responsibility was to install hanger wires supporting the suspended ceilings so as not to interfere with the light fixtures.

Mr. Smith testified further that he and his company had bid for the job on the basis of installing the 1½-inch supporting channel for the support of the suspended ceiling at right angles to the lighting fixtures; the custom and usage in the industry regarding the installation of suspended ceilings in southern California in 1961-1963 was that when the plans and specifications were silent as to the direction of the 1½-inch supporting channel, the channel could be installed in the most reasonable manner, at right angles to the light fixtures since this procedure was cheaper; the custom and usage in the industry was also that the lighting fixtures should be installed before the installation of the suspended ceiling; on this job, the 1½-inch channels were installed by Acoustics prior to the installation of the light fixtures; the plans and specifications did not state that the lighting fixtures were to be installed first, but this was his interpretation of the plans and specifications; Acoustics was not given a location of lighting fixtures and other mechanical equipment before hanger wires which support the 1½-inch channels were dropped from the cement forms; since the hanger wires and the 1½-inch channels were being installed prior to the lighting fixtures, a layout of the lighting fixtures was necessary before installation of hanger wires and channels because Acoustics could not determine from the general reflected ceiling plan where the light fixtures were going to go; Acoustics did this layout work for the locations of the lighting fixtures; this layout work, in his opinion, was not required to be done by the acoustical section of the specifications, and was, therefore, extra or additional work at the value of somewhere between three cents and five cents a square foot.

Mr. Smith testified further that it was the intention of Acoustics to install the 1½-inch channel for the support of the ceiling at right angles to the

lighting fixtures, however, Mr. Omelia, a State inspector on the job, instructed Trepte, the general contractor, to have Acoustics run their channel parallel to the lighting fixtures in order to support such fixtures. Mr. Smith testified further that he ". . . stipulated to Mr. Omelia that it was not provided in the specifications that we had to run the channels parallel to the light fixtures, and he stated to me that it had been done that way on the last job that he had been inspector on, and I believe he referred to a State Hospital job, and he said that that was the way he wanted it done on this job, and I stated that I didn't see any reason why we should have to do that, and if he was going to insist upon it I stated that we were going to pull the job, we were going to get a decision as to why we were running 'em in that manner. . . . Mr. Omelia stated at that time that we could not pull the job, there was a clause in the specifications entitled 51, or something like that, whereby we were required to proceed."

Mr. Smith testified further that he was directed by Trepte to install the 1½-inch channel as required by Mr. Omelia; he never requested or checked into Mr. Omelia's authority to require the work to be done in a particular manner; this method of installation necessitated the use of extra channel and the dropping of additional channel wires; he made no attempt to compute the exact cost of the extra channel or hanger wires.

Mr. Smith estimated Acoustics' damages as follows: his stated 230,000 square feet of acoustic tile suspended ceiling and the reasonable charge for layout of the light fixtures is $0.04 a square foot (based upon $0.035 for the electrical work and $0.005 for certificate), making a total of $8,050; the reasonable value of supporting the recessed light fixtures was figured at $25,595 on the basis of 17,063 feet on 1½-inch channel times $1.50 (based upon the price of recessed light fixtures and added costs for adjusting the ceiling and the clips "et cetera"); he did not know exactly how much the support and layout work actually cost.

Mr. Smith testified further that he made a request for compensation from the State, Steiny and Trepte for the extra work; thereafter, Trepte added overhead, profits and cost to Acoustics' figure and made a claim against the State for layout and support of lighting fixtures for $40,995.59; this claim dealing with the framing or support of the fixtures was denied; the State Architect rejected the claim in connection with the layout and the framing or support of the fixtures.

On cross-examination Mr. Smith testified that neither he nor Acoustics was given any written request to proceed with the installation of the 1½-inch channels or dropping of hanger wires in any particular manner; he was not aware how long after the channel had been run parallel to the

light fixtures, that a protest was made to the State; the question as to which way the channel would run was decided before he came on the job; it was possible that Acoustics had been installing the hanger wires in a pattern to support the channels parallel to the fixtures prior to his conversation with Mr. Omelia.

The National Acoustical Contractor's Association defines the term "ceiling suspension system" to "mean the entire network or grid of structural components which provides support for acoustical ceiling tile, acoustical ceiling panels, lighting fixtures, and air diffusers."

Mr. Horace D. Bowman, vice-president and project manager of Trepte, called as a witness on behalf of Acoustics, testified that he first came on the job in the latter part of March or the first part of April 1963; he was generally familiar with State construction jobs and it was the custom of the State of California to have an inspector on the job at all times; the State inspector had the power, more or less, to mediate any differences between the contractors; it was customary for the State inspector to orally order a contractor to proceed or not to proceed with certain work.

Mr. Bowman testified further that he was familiar with the plans and specifications on the project including those relating to the installation of acoustic tile suspended ceilings; in his opinion, if Acoustics had installed these 1½-inch channels in the ceiling layout, then Acoustics would have fulfilled its part of the specifications; he received oral instructions from the State inspector to change the installation of the 1½-inch channels so that the ceiling fixtures could be hung off the channels; Mr. Eisenrich, Mr. Bowman's foreman, Mr. Erickson, Mr. Bowman's supervisor, and a representative from Acoustics did the layout work in connection with the acoustic tile ceiling; he was of the opinion that layout of the location and placement of the ceiling fixtures was part of the contract work of Steiny, the electrical contractor; there was nothing in the plans and specifications requiring Trepte to provide framing and support of the electrical lighting fixtures; Trepte received no "coordination" from Steiny in reference to the layout work for the lighting fixtures for the acoustic tile suspended ceiling.

Mr. Oakley Davis, called as a witness on behalf of Acoustics, testified that in 1962 and 1963 he was employed by Acoustics as a superintendent; he had experience in the installation of acoustical tile since 1948; he was acquainted with the plans and specifications relating to the subject project; at the commencement of the dropping of the hanger wires, he had a conversation with Steiny's superintendent concerning the lighting fixtures; Steiny's superintendent stated that Acoustics would be compensated for any work that Acoustics did in laying out and supporting the light fixtures;

Mr. Omelia told Mr. Davis that he would see to it that Acoustics would be paid for the framing and support of the lighting fixtures.

Mr. Davis testified further that it was his opinion, based upon the plans and specifications, that the lighting fixtures would be hung independently of, and would be supported by some method other than from the acoustical ceilings; nonetheless, his men provided the framing and support for the lighting fixtures.

Mr. George Lamb, called as a witness on behalf of Acoustics, testified that he was a consultant in the business of writing construction specifications; at the request of Acoustics, he examined the plans and specifications for the project; based upon such plans and specifications, it was his opinion that there was nothing therein which required Trepte or its subcontractor, Acoustics, to provide any kind of support for the electrical fixtures; such plans and specifications were not ambiguous and required the electrical contractor to lay out, frame and support the lighting fixtures.

Mr. Roland G. Medlicott, executive vice-president and operations officer of Trepte, called as a witness, testified that he had worked in the construction industry since 1945; in 1963 he was familiar with the construction project at San Fernando Valley State College and the plans and specifications for the job; he was of the opinion that the plans and specifications called for the electrical contractor to support the lighting fixtures and lay out the exact location of such fixtures; Mr. Omelia, a State inspector, told him that this work was under the contract for General Work and that he had directed Acoustics, Trepte's subcontractor, to do the job; he did not know whether Trepte was ever directed in writing to proceed with the work in a particular manner; a few weeks after his conversation with Omelia, Trepte made a written protest by means of a letter to the Headquarters Division of Architects in Sacramento, but was turned down.

Mr. Medlicott testified further that the plans and specifications did not state the direction in which the channel for suspension of an acoustic tile ceiling was to run; normally there is language in the documents to indicate the channel would run the longest dimension, which in the instant case would be parallel to the lighting fixtures; the plans and specifications were ambiguous, and Mr. Omelia resolved the ambiguity and directed the work to proceed; the order of constructing a ceiling is to hang the hanger wires and install the channels, then place the runner bars and the tile, and then install the light fixtures; once the 1½-inch channels were installed parallel to the light fixtures, no additional costs would be incurred by support of the light fixtures by the 1½-inch channels; none of Trepte's correspondence to

the State specifically stated that Trepte had been directed by a State inspector to do the work in a particular manner.

James Goring, a chief of the construction administration department of Daniel Mann Johnson & Mendenhall, architects and engineers, called as a witness on behalf of the State, testified, after relating his qualifications, that he was familiar with the plans and specifications for the project; he had personally analyzed and gone over in great detail the electrical specifications and those general specifications dealing with the acoustical tile suspended ceilings; in his opinion, based on his study of the specifications, the specifications are somewhat ambiguous in that there are references to openings for lighting fixtures in the general work specifications, but there are also references to supports for lighting fixtures in the electrical specifications; it was customary in the industry to install lighting fixtures in acoustic tile suspended ceilings from the same support which supports the ceilings; he had never seen any jobs or construction projects in which the lighting fixtures were of "a continuous nature" of 24 feet where this was not done; the conveying channels could be run in either direction but the light fixture channels would still have to be placed on each side of the light fixtures; the ceiling installations as proposed by Trepte would be unacceptable because a hole would be created in the ceiling without bracing the sides of the openings; the specifications, when read in the light of custom and usage in the construction industry, require the installation of channels running on each side of the light fixtures.

Mr. Goring testified further that in his opinion the specifications for electrical work did not require the electrical contractor to frame the openings for the light fixtures; in a No. 7 mounting, the electrical contractor would expect to hang his fixtures from the channel which supports the suspended ceiling; substantially, according to the plans and specifications, the acoustical contractor should have done the work without receiving extra compensation therefor because the plans called for it; according to the plans and specifications, the acoustical contractor should have done the work and how he did it would be immaterial; the general work contractor and the electrical contractor should contribute to the layout and the general contractor would be partially responsible for the layout; the general contractor should not be paid extra for the layout; he would consider it unreasonable for a man of adequate qualifications as an expert to testify the exact opposite of his (Mr. Goring's) testimony in regard to the support of the lighting fixtures under the specifications.

Sidney Paule, called as a witness on behalf of the State, after stating his qualifications to testify as an expert in the field of building construction, testified that he was area supervisor for the State Office of Architecture and

Construction; his office was located at San Fernando Valley State College from 1961 through 1963; Mr. Omelia worked directly under his (Mr. Paule's) supervision on the instant project as the inspector assigned to the project; there were statewide policies concerning the question of changes and instructions to contractors; such contractors were notified of these policies both orally and in writing; at the start of each state job a meeting is called regarding statements and policies; on each state job a letter is sent to the contractors informing them of the procedures for changed work; Trepte was sent such a letter; he spoke to Mr. Omelia on many occasions during the course of the work on the project; Mr. Omelia died sometime between the Claims Review Board hearing and the date of trial.

Mr. Paule testified that he sat on the Claims Review Board for the State Architect which passed upon Trepte's claim for extra work for layout and support of the light fixtures; the function of the board is to listen to the presentation by the contractor and make an objective interpretation of the plans and specifications; item S of Claim No. 883 was by Trepte for layout and support of the lighting fixtures; the board considered this a portion of one claim; such claim was denied by the board.

Mr. Paule testified further that the plans and specifications, in his opinion, called for the general contractor to provide the openings for the lighting fixtures, once the electrical contractor had informed the general contractor how wide and how long the light fixtures were; information was readily available on the job to show the size of the openings; he was also of the opinion that the plans and specifications called for the general contractor to support the lighting fixtures; an essential feature of a mechanically suspended ceiling is its ability to support lighting fixtures whichever way the ceiling channel is run; he had never seen a ceiling constructed with 1½-inch channels in which the light fixtures were not supported on the ceiling; the custom and usage of the industry is not to place light fixtures into a recessed ceiling before the ceiling is put up.

Mr. Paule testified further that as far as the State is concerned, a claim for extras arises only at the end of a job when a contractor is not satisfied with the State's proposed final payment and the contractor then makes a claim for additional money; he never received any correspondence from Trepte protesting that they had been directed to do extra work by Mr. Omelia; he had seen Mr. Bowman (vice-president and project manager of Trepte) frequently on the job; he also had seen Mr. Medlicott (a vice-president of Trepte) on regular occasions throughout the job, and Mr. Erickson, who was superintendent for Trepte of the site; none of these men ever mentioned or discussed anything about layout or support of the lighting fixtures.

Mr. James H. Woods, called as a witness on behalf of the State, testified that he was employed as foreman by Acoustics on the San Fernando State College construction project; he was to install the hanger wires and put up the channels; when he first came on the job, some hanger wires had already been installed; these hanger wires had to be reinstalled, and more put up because the layout was wrong; he was told that Mr. Davis came out to the job and installed on weekends; he was told by the electrical contractor the fixture sizes, and he laid out the location of the fixtures himself as a part of laying out the location of the hanger wires; it would not have taken very much time to measure the center of the room and measure out to the 8 feet necessary from that point for the three fixtures, once the dimension of the room was known; if the deck above the interior of each room had been laid out, it would have taken no extra time to lay out the three light fixtures themselves; almost all of the Z-bars came on the job precut so as to fit exactly between the light fixtures; he had never seen an acoustic tile suspended ceiling with recessed lighting fixtures in which the support members (1½-inch channel) were run perpendicular to the light fixtures; after examining the plans and specifications, he concluded that the only way the ceiling installation could be laid out was by running the channel parallel to the lighting fixtures; he had been at a meeting concerning the layout problems where Mr. Omelia stated that "Mr. Erick (General Contractor) should write a letter to Acoustics, stating that they would be compensated for the layout of the electrical work on the job because Acoustics was a subcontractor to Trepte, they were not a subcontractor to the electrical company, which was the prime contractor, and he could not authorize a letter himself because we were not a prime contractor"; Mr. Omelia stated that the question of reimbursement would be taken care of at the time of closing the job either by the electrician "or possibly by the State, one or the other."

Mr. Howard Stocking, called as a witness on behalf of the State, testified that he was a registered civil engineer and was employed as a district supervisor for the Office of Architecture and Construction of the State of California. After stating his background and experience, he testified that he was familiar with the plans and specifications on the instant project; he had replaced Mr. Paule as district supervisor in the southern area in 1963; on July 3, 1963, he wrote a letter to Mr. Medlicott of Trepte setting forth his opinion, which he still holds, and the State's position regarding Trepte's claim for extra work for layout and support of the light fixtures, as follows:

"Reference is made to your letters of May 15, 1963, and June 10, 1963, with enclosures from your subcontractor, Acoustics, Inc., regarding extra

compensation for layout and support of light fixtures in the amount of $29,562.23.

"As indicated to Mr. Medlicott on June 26, 1963, at the job, the work as outlined is considered already your contractual obligation for the following reasons:

"Paragraph 8K-04g requires the furnishing and installing of a *complete* suspension system for the No. 7 mounting of acoustic tile using cold rolled 1½" channels not to be spaced over four (4) feet on centers.

"Under Paragraph 8K-05, it is further required that tile units be placed symmetrically about the center of rooms, and work shall be coordinated with work of other trades in providing openings for lighting fixtures and ventilating fixtures. Where recessed lighting fixtures occur, 'tile shall be installed with *regard* to ceiling pattern formed by light fixtures.' (This pattern is that as shown in the electrical drawings furnished as part of your contract under Article 1A-03 as reference drawings.)

"It is obvious from records and job conditions that at the time of concrete forming for the various floor slabs above acoustic tile ceilings an agreement had been reached between the electrician and the acoustic tile men as to the ceiling layout, particularly as to the location of the recessed fixtures and how the tile suspension was to be constructed to accommodate these openings, as can be observed from the location of hanger wires.

"This laying out and installing of hanger wires was accomplished as provided for under Article 1A-05b, which requires the General Contractor to lay out on the forms, walls, flooring, etc., the exact location of all partitions as a guide to all trades and to the other contractors.

"Further, under Article 1A-06b, each contractor is responsible for the correct location of anchorage holes and the like, for his work; but when it is required that anchorage or *preparation* in the structure must be made for any of the mechanical or electrical or other prime contractors, then the General Contractor shall perform or make the necessary preparations as a part of his work.

"It is also understood on the basis of this agreed layout that your subcontractor proceeded to order his tile suspension bars precut prior to delivery to the job and thus was unable to modify the spacing of the 1½" channels at each side of the recessed fixtures, which resulted in added cost to the electrical contractor to adapt his approved fixture mounting brackets to suit the layout as originally agreed upon.

"Except for minor adjustments to better center the tile pattern or overcome errors in the original layout, the subsequent installation of acoustic tile has not involved any additional layout work of consequence to accommodate recessed lighting fixtures or ventilation outlets over and above that reasonably expected in the installation of an acoustic tile ceiling as specified. For the reasons outlined above a change order appears unjustified and will not be initiated as requested."

Mr. Stocking testified further that he had never seen specifications which called for recessed light fixtures in acoustic tile suspended ceilings to be supported on anything but the channel which also supported the ceiling itself, and he had never seen a job in which such fixtures in such a ceiling were supported on anything other than the channel which also supported the ceiling itself; he was of the opinion that the specifications regarding the acoustic tile ceiling were not deficient, although he stated, "I do think we could have added a little clarity to it on a couple of details."

Mr. Herman Light, called as a witness on behalf of Steiny, after stating his qualifications as an expert in the field of architecture and building construction, testified that he was familiar with the custom and practice in the construction industry concerning the installation of mechanically suspended acoustic ceilings from 1960 through 1965; he reviewed the plans and specifications on the within project and was of the opinion that the layout was left to the discretion of the people who had to do the installation; running the channel perpendicular to the light fixtures and installing a header parallel to the fixtures would be more expensive than running all of the channels parallel to the fixtures; he was of the opinion that the plans and specifications did not require the electrical contractor to establish the precise location of the recessed light fixtures, but that the ceiling contractor must establish the exact location of the fixtures by his ceiling title pattern; the ceiling contractor must establish his joint pattern and the electrician works to it; the ceiling channel is ordinarily the support for light fixtures in this type of independent ceiling; if there were any questions concerning the specifications, the bidders would check back and forth with each other during the bidding period as to who was going to supply what, as the plans and specifications did not contain a specific detail on this particular item.

Mr. John Zuponcic, called as a witness on behalf of the State, testified that he was an electrical inspector for the Office of Architecture and Construction of the State, was a journeyman electrician, and was one of the electrical inspectors on the within project; the instructions from the approval letter by the State of the recessed fixtures dated April 23, 1962, and the brochure submitted by the electrical contractor for such approval were available; this brochure shows the installation of the light fixtures on 1½-

inch channel running parallel and adjacent to the fixtures; he had never seen recessed light fixtures installed in a mechanically suspended ceiling which were not hung from the same support as was used to support the ceiling itself; light fixtures can only be hung from the supporting channels.

Mr. Tommie Hamner, called as a witness on behalf of the State, after stating his background of education and experience in the field of building construction, testified that he was an estimator, employed by the State, to ascertain fair market value of each State project before it is put out to bid; he reviewed the plans and specifications on the subject project; in his opinion, based upon the plans and specifications, it was the duty of the general contractor or the acoustical tile subcontractor to locate or pinpoint the center of the room as the start of the layout for the light fixtures; it should not take over five minutes to layout the two lines after the center of the room had been determined; he analyzed the additional cost of laying out the location of the light fixtures after the dimension of each room was known, and was of the opinion that there was a total additional cost of $652; using Acoustics' figures, it would take 4 hours and 27 minutes to lay out the location of the light fixtures in each room.

On October 17, 1961, Mr. James A. Gillem, Assistant State Architect, had a conversation with Mr. Howard Smith (then vice-president of Acoustics), in which Mr. Smith stated to Mr. Gillem that he was "in on a bad bid" on a subcontract on San Fernando Valley State College.

Mr. Glen Mitchell, Jr., testified that he was vice-president and secretary of Steiny. After stating his background of education and experience in general building, general engineering and in electrical engineering, he testified that he was familiar with the plans and specifications on the subject project; he was responsible for the estimating, purchasing and management of the project for Steiny; in his opinion, based upon the plans and specifications, Steiny was not required to provide the structural channels to support the lighting fixtures; the custom and practice in the industry was that the recessed lighting fixtures were to be supported from the structural system of the ceiling; it would be virtually impossible for Steiny to precisely show the location of the lighting fixtures in the ceiling system because the location of such fixtures is a function of the modular tile pattern as it is installed in the ceiling; when he examined the plans and specifications in preparation to bid, he saw a "No. 7 type system" specified; according to custom and practice in the industry, this meant that support for the recessed lighting fixtures would be provided by the ceiling structure.

Mr. Douglas Eisenrich, vice-president in charge of construction, and general field superintendent for Steiny, testified that he had spent 19 years in various aspects of the electrical construction industry; he was in charge of

field construction on the subject project; he was familiar with the plans and specifications of the job and was of the opinion that the electrical contractor was not required by the plans and specifications to furnish the 1½-inch channels to support the light fixtures; the custom and practice in the industry with respect to the installation of light fixtures was that the channels were supplied to the electrical contractor by others.

## Rebuttal

Mr. John Stanley, president of Harold E. Shugart Company, an acoustic contracting firm, called as a witness on behalf of Acoustics, testified that he had been in the acoustical ceiling business for 33 years; a "No. 7 mounting" refers only to an acoustic tile suspended ceiling and does not refer to support for recessed light fixtures; he reviewed the plans and specifications for the subject job and was of the opinion that the acoustical tile contractor was not required to frame and support the light fixtures; running the 1½-inch channel perpendicular to the light fixtures would be in accordance with the plans and specifications; he did not think the layout of the location of the light fixtures was the responsibility of the acoustical contractor; this was the responsibility of the electrical contractor.

Mr. Vincent Palmer, called as a witness on behalf of Trepte, after stating his background of education and experience in the field of engineering and architecture, testified that he had read the specifications relating to the acoustical and electrical work, and that in his opinion the acoustical specifications could not reasonably be interpreted as to include the work of providing 1½-inch channels for the support of the lighting fixtures; the responsibility for the support of the fixtures rests upon the electrical contractor; nothing in the specifications prohibited the running of the 1½-inch ceiling channel perpendicular to the light fixtures.

## Contentions on Appeal

State contends that (1) there is no substantial evidence of gross error on the part of the State Architect in denying the claim of Trepte (and Acoustics) for extra work; (2) Trepte is barred from recovering against the State because there is no showing of compliance with sections 29, 40 and 42 of the general conditions of the contract; (3) the trial court erred in not allowing the State to amend its pleadings to include an important and crucial defense, and (4) the trial court erred in admitting hearsay evidence consisting of purported out-of-court statements of Mr. Omelia, which greatly prejudiced the State.

Trepte urges, after denying the errors claimed by the State, that the trial court erred in its award of damages.

Acoustics urges that the trial court erred (1) in allowing attorneys' fees in the sum of $1,500 as costs to Steiny, and (2) in not striking item 26 (bond premium) of Steiny's memorandum of costs and disbursements.

Steiny urges, after denying the errors claimed by Acoustics, that the trial court erred in the amount of attorneys' fees allowed in that the uncontroverted evidence required an award of attorneys' fees in a substantially greater amount.

General urges that the attorneys' fees allowed it were inadequate.

### State's Appeal

### *Claimed Gross Error on Part of State Architect*

Section 51 of the General Provisions of the contract provides as follows:

"51. Final Payment and Claims:

"After acceptance of the contract, the Department of Public Works will cause to be made a semifinal payment estimate, which shall state the total value of work done under the contract, the amount thereof already paid, and the balance earned but not yet paid to the Contractor. The difference between the amount still unpaid, and any sums to be withheld for incomplete work, liquidated damages, or for any other cause under the contract, shall constitute the State's proposed final payment which the State proposes to make to the Contractor in full satisfaction of all moneys earned under or arising out of the contract, provided, however, that he may claim additional payment in the manner and circumstances set forth below. The State shall submit the semifinal payment estimate to the Contractor and shall concurrently issue a warrant in the amount shown on the semifinal payment estimate as the State's proposed final payment. *Within thirty (30) days thereafter, the Contractor shall submit to the State Architect his written approval of the State's proposed final payment, or a written statement of any or all claims which he has for additional compensation in excess thereof, including any claim he may have for sums withheld from the contract amount.*

"If the Contractor submits such approval or if he files no claim within the time specified, such action shall constitute a waiver by him of all claim or right to any additional compensation under or arising out of the contract, over the amount of the State's proposed final payment, and the State's proposed final payment shall thereupon become final.

"However, if the Contractor within said period of thirty (30) days does file claim for additional sums in excess of the State's proposed final payment,

as money earned under or arising out of the contract, the State Architect shall consider and investigate such claim. If he finds that no additional sums are due over the amount of the State's proposed final payment, then the semifinal payment estimate and the State's proposed final payment made thereunder shall become final and shall thereupon become conclusive and binding against both parties on all questions relating to the performance of the contract and the amount of work done thereunder and compensation therefor, except in the case of gross error. If the State Architect finds that additional sums are due under the contract, he shall issue his final written payment estimate in such amount and the State will make a final payment of the additional amount so found to be due. Such final payment estimate and final payment shall thereupon become conclusive and binding against both parties to the contract on all questions relating to the performance of the contract and the amount of work done thereunder and compensation therefor, except in the case of *gross error*. Payment on the final estimate will be made within sixty (60) days from the date of acceptance of the contract by the Director of Public Works, provided all pertinent matters have been satisfactorily resolved. All prior estimates and payments shall be subject to correction in the final estimate and payment." (Italics added.)

Under the foregoing section of the General Provisions of the contract between the State and Trepte, the decision of the State Architect denying the claim of Trepte (and Acoustics, Trepte's subcontractor) for extra compensation for the ceiling layout and support for the light fixtures was binding upon the parties in the absence of gross error.

■ Gross error, as that term has been employed in construction contracts, establishes a nonjudicial remedy for the settlement of disputed contract claims. It has been equated with fraud, constructive fraud, bad faith or failure to exercise honest judgment, as well as decisions rejecting administrative determination when it was arbitrary. (*Clack* v. *State of California ex rel. Dept. Pub. Wks.,* 275 Cal.App.2d 743, 746 [80 Cal.Rptr. 274].) It includes arbitrary action and gross mistake. (*Macomber* v. *State of California,* 250 Cal.App.2d 391, 397 [58 Cal.Rptr. 393]; *A. Teichert & Son, Inc.* v. *State of Cal.,* 238 Cal.App.2d 736, 757 [48 Cal.Rptr. 225], overruled on a different point in *E. H. Morrill Co.* v. *State of California,* 65 Cal.2d 787, 791-792 [56 Cal.Rptr. 479, 423 P.2d 551]; see also *Brown* v. *Aguilar,* 202 Cal. 143, 151 [259 P. 735].)

It has been said that "An action is arbitrary when it is based on no more than the will or desire of the decision-maker and not supported by a fair or substantial reason (*Bedford Inv. Co.* v. *Folb* (1947) 79 Cal.App.2d 363, 366 [180 P.2d 361]; *State* ex rel. *Cosmopolis Consol. School Dist.* v. *Bruno* (1963) 61 Wn.2d 461 [378 P.2d 691, 696]; see Jaffe, *Judicial Review:*

*Question of Fact,* 69 Harv.L.Rev. 1020, 1021 (1956)). In the context of fact-finding, arbitrariness characterizes the decision when it lacks substantial support in the evidence. (*McDonough* v. *Goodcell* (1939) 13 Cal.2d 741, 749 [91 P.2d 1035, 123 A.L.R. 1205]; *Riley* v. *Chambers* (1919) 181 Cal. 589, 595 [185 P. 855, 8 A.L.R. 418]; *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 478 [64 Cal.Rptr. 808].) Fraud or bad faith, as morally reprehensible qualities, are not necessary attributes of arbitrariness, hence are not indispensable ingredients of gross error." (*Clack* v. *State of California* ex rel. *Dept. Pub. Wks.,* 275 Cal.App.2d 743, 747 [80 Cal.Rptr. 274].)

■ Here, there is nothing in the record to show actual fraud, constructive fraud, bad faith or dishonest judgment on the part of the State Architect. Nor is there a showing of gross error on the theory that his decision was arbitrary, since such decision is supported by substantial evidence in the record. There was an abundance of testimony in the record by expert witnesses, well qualified in their field, to the effect that under the plans and specifications, the layout of the ceiling and provision of support for the lighting fixtures were part of the general work contracted for by Trepte, and under the contract Trepte, and therefore its subcontractor Acoustics, were obligated to do the layout and furnish the support for the lighting fixtures without the right to claim and receive extra compensation therefor. In this state of the record, the trial court's finding that the State committed gross error in interpreting the contract and the plans and specifications incorporated therein is not supported by substantial evidence.

### Compliance with Sections 29, 40 and 42 of the General Conditions

■ Section 29 of the General Conditions of the contract between Trepte and the State reads in part as follows:

"a. Interpretation: The plans, specifications and all change orders and supplemental agreements and documents are essential parts of this contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be cooperative, and to describe and to provide for a complete work. . . .

"Should any discrepancies or apparent error be found in the plans or specifications, or should any work of others affect this work, the Contractor shall notify the State Architect at once. All such discrepancies or errors shall be clarified within a reasonable time by the State Architect, whose decision shall be final. Should the Contractor proceed with the work affected without instruction from the State Architect, he shall be responsible for any damage, defect or added cost resulting therefrom.

"All questions under this Article concerning clarification and interpretation of plans and specifications shall be referred by the prime Contractor to the State Architect through the Construction Supervisor or Inspector on the job site.

"b. Additional details: The State may furnish additional details to explain the work more fully. Such additional details shall be a part of this contract.

"Should it appear that the work to be done or any of the matters relative thereto are not sufficiently detailed or explained in the plans and specifications, the Contractor shall apply at once for additional details before proceeding with the work affected. Should the Contractor proceed with the work without applying for additional details or should he apply and then proceed with the work before receipt of such additional details, then he shall remove and replace or adjust at his own expense any work which is not in accordance with the additional details.

"Should any additional details be, in the opinion of the Contractor, beyond the scope of his contract, written notice thereof must be given to the State within fifteen (15) calendar days following receipt of such details and in any event prior to commencement of work thereon. The State Architect will then consider the claim, and if, in his judgment it is justified, the drawings will be revised or the extra work authorized. The Contractor shall receive no additional compensation for such work unless he gives the State written notice thereof within fifteen (15) days specified above."

Under the foregoing section, if there were any errors or discrepancies in the plans and specifications, or if there was any question as to the effect of the work of others in relation to the assigned work of the general contractor, the State Architect was to be notified by the general contractor at once, and if the general contractor continued with the work without any instruction from the State Architect, he would be responsible for any added cost resulting therefrom. Also if in the opinion of the general contractor any additional details that were furnished by the State Architect were beyond the scope of the contract, the general contractor was bound to give the State Architect written notice within 15 calendar days following receipt of such details or at least prior to the work thereon, but if no such written notice was given, the general contractor could not recover any extra compensation. There is no evidence in the record that Trepte complied with the requirements of section 29 of the General Provisions of the contract.

Section 40 of the General Provisions of the contract reads as follows:

"40. Dispute as to Contract Requirements:

"Where the Contractor and the State Architect fail to agree as to whether

or not any work is within the scope of the contract requirements, the Contractor shall nevertheless immediately perform such work upon receipt from the State Architect of written order to do so. Within thirty (30) calendar days after receipt of such order, the Contractor may submit a written protest to the State Architect, specifying in detail in what particulars the contract requirements were exceeded, and the appropriate change in cost resulting therefrom. Failure to submit such protest within the period specified shall constitute a waiver of any and all right to adjustment in compensation and contract time due to such work, and the Contractor thereafter shall be entitled to no additional compensation whatsoever for the performance thereof. For any such work which is found to exceed the contract requirements, there shall be an adjustment in compensation and contract time on the same basis as for any other change in the work."

Under the foregoing section, the general contractor must submit a written protest to the State Architect within 30 days after receiving a written order from the State Architect to perform any disputed work. If he fails to do so, he shall not be entitled to any extra compensation for the performance thereof.

Mr. Medlicott, executive vice-president of Trepte, testified that upon oral disagreement with Mr. Omelia, the State inspector, deceased at the time of trial, he (Mr. Medlicott) notified the State by letter that Trepte was doing the work "under protest."[1]

The record shows that Trepte never received a written order from the State Architect to perform any disputed work, but instead informed the State by letter after oral discussion with Mr. Omelia. The record does not show that Trepte ever filed a protest within 30 calendar days of receiving a written order from the State Architect to perform work on the ceiling layout and support of light fixtures in which Trepte claimed that such work was in excess of the contractual requirements. Although Mr. Medlicott testified that he made a protest by means of a letter to the Headquarter's Division of Architecture in Sacramento, he could not say that he received any written notice upon which to protest. Mr. Medlicott could not testify whether or not Trepte had ever been directed in writing to proceed a certain way, although he testified that he believed there could have been a "void verbal order signed by Mr. Omelia" directing the work to be accomplished; he did not know whether such a document ever existed. From the foregoing it appears that there is no evidence that a written order from the State Architect was ever made and received by Trepte. Therefore, it was not shown that a protest had been filed pursuant to a written order as required by the contract.

[1]Mr. Paule, construction supervisor with the State Office of Architecture and Construction, testified that he had never received such a letter, and did not know that any such letter was in the file.

The evidence, at the most, shows that Mr. Medlicott made what he called a "protest" by means of a letter upon talking with Mr. Omelia, and had determined that the latter was not going to change his position. His sole description of this letter was a reference to the allegation that Trepte had been directed to do the work and that they were proceeding under protest. From the foregoing, it appears that there is no evidence that the letter above referred to complied with the other essential requirements of a protest, as defined by section 40 of the General Conditions, to wit: ". . . specifying in detail in what particulars the contract requirements were exceeded, and the appropriate change in cost resulting therefrom."

■ Compliance with contractual provisions for written orders is indispensible in order to recover for alleged extra work. (*A. Teichert & Son, Inc.* v. *State of Cal.,* 238 Cal.App.2d 736, 758 [48 Cal.Rptr. 255]; *Bares* v. *City of Portola,* 124 Cal.App.2d 813, 820-821 [269 P.2d 239].) Subordinate field personnel (such as Mr. Omelia here) cannot waive the mandatory contract requirement that ordered changes or additions or extras be approved in writing by the State Architect. (*A. Teichert & Son, Inc.* v. *State of Cal., supra;* see also *Contra Costa Const. Co.* v. *Daly City,* 48 Cal.App. 622, 624-625 [192 P. 178].) ■ The contract provisions show explicitly that Mr. Omelia had no authority to order the performance of disputed work (section 40, General Conditions), or order changes in the construction (section 42, General Conditions).

Sections 29, 40 and 42 of the General Conditions established conditions precedent to the right of Trepte to claim or receive additional moneys for allegedly extra work, and Trepte's failure to comply with these conditions releases the State from liability therefor. (See *Bennett* v. *Carlen,* 213 Cal. App.2d 307, 309-311 [28 Cal.Rptr. 647]; *Sosin* v. *Richardson,* 210 Cal. App.2d 258, 264-265 [26 Cal.Rptr. 610].) Assuming, arguendo, that layout of the ceiling and support of the light fixtures were extra work beyond the requirements of the contract for General Work, Trepte is precluded from recovering additional compensation therefor because it failed to comply with the conditions set forth in sections 29, 40 and 42 of the General Conditions of the contract.

■ Trepte urges that the State may not here rely on sections 29, 40 and 42 of the General Conditions of the contract as a bar to Trepte's right of recovery because no issue was presented with respect thereto in the State's responsive pleadings to the cross-complaint.

Trepte cites and relies on *Standard Oil Co.* v. *Houser,* 101 Cal.App.2d 480, 488 [225 P.2d 539], in support of its position. This was an action to enforce the provisions of an unconditional continuing guarantee. The court

there held that it was the duty of the guarantor to "plead any limitation, condition precedent, exoneration, or any similar defense. Such matters are affirmative defenses and are not available unless pleaded." (See also *Pacific M. & T. Co.* v. *Bonding & Ins. Co.,* 192 Cal. 278, 284-285 [219 P. 972]; *Blackwood* v. *McCallum,* 187 Cal. 655, 659 [203 P. 758]; *Thompson* v. *Koeller,* 183 Cal. 476, 479 et seq. [191 P. 927]; *Hobson* v. *Metropolitan Casualty Ins. Co.,* 120 Cal.App. 727, 730 [8 P.2d 150].)

The within action is not a suit based upon an unconditional guaranty or obligation. Trepte's cross-complaint against the State sounds in breach of contract. ■ A statement of a cause of action for breach of contract requires a pleading of (1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damage to plaintiff therefrom. (2 Witkin, Cal. Procedure (1954) Pleading, § 251, p. 1226.) ■ It was incumbent on Trepte to plead and to prove that it had performed all things on its part to be performed under the terms of the contract in order to state a cause of action for breach thereof and to recover damages for such breach. The State was entitled to establish that Trepte had not performed the conditions precedent under the contract necessary to give Trepte the right of recovery for the claimed breach thereof without pleading such failure as a separate defense.

In view of the foregoing conclusion, we deem it unnecessary to comment on the other points raised by the State.

### TREPTE'S APPEAL

Trepte urges that the court's finding that the value of the work involved was $7,000 is not supported by the evidence and that the value should have been in the sum of $40,995.59.

This contention, no doubt, is urged in the hope that the judgment in favor of Trepte and against the State would be affirmed.

Trepte's witnesses testified that the total cost of additional work was the sum of $40,995.59. Mr. Hamner, called on behalf of the State testified that the additional cost would be $654. The trial court was not obligated to accept either estimate. It was held in *Healy* v. *Brewster,* 251 Cal.App.2d 541, 553 [59 Cal.Rptr. 752], that "There is no requirement that the trial court set out either its computations, or the particular evidence upon which it may have relied in determining the amount of damages. Nor is an appellate court concerned with the weight of testimony, particularly with reference to the amount of damages. The pertinent inquiry is whether there was substantial support in the evidence for the finding as to damages, and the appellants have the burden of demonstrating that the determination as to the

amount of damages was erroneous." (See also *City of Salinas* v. *Souza & McCue Construction Co.*, 66 Cal.2d 217, 224-225 [57 Cal.Rptr. 337, 424 P.2d 921].) Trepte has not demonstrated that the trial court's determination as to the amount of damages was erroneous.

### ACOUSTIC'S APPEAL

#### *Allowance of Attorneys' Fees and Bond Premiums as Costs to Steiny*

■ This appeal is from the order taxing costs, and relates to the trial court's claimed refusal to strike from Steiny's memorandum of costs and disbursements item 26 which was a claim by Steiny that it had paid the sum of $3,343.62 to Argonaut Insurance Company as premiums on a bond posted by Steiny to release funds held as the result of a stop notice filed by Acoustics. (Cf. Code Civ. Proc., § 1035.)[2] The appeal also relates to the allowance of the sum of $1,500 as attorneys' fees claimed by Steiny as costs, although not included in its memorandum of costs and disbursements, pursuant to the provisions of section 4207, Government Code.[3]

The judgment as it relates to action 837741 awards Steiny the sum of $1,513.50 by way of costs and disbursements, which is made up of two items. One for $13.50 listed as a filing fee, and the other for $1,500 designated as attorneys' fees. It is obvious from the record that the sum claimed as bond premium was not included in the judgment.

It is clear from the memorandum of costs and disbursements filed by Steiny that it asked for the allowance of $3,343.62 for premiums paid on the bond issued by Argonaut Insurance Company to release the funds due Steiny held by the State as a result of the stop notice filed by Acoustics. It is equally clear that in Acoustics' motion to tax costs it sought to strike this item (item 26) from Steiny's memorandum. The minute order from which the appeal is taken denied Acoustics' motion, thus leaving the bond premium as

---

[2]Code of Civil Procedure section 1035 reads: "Whenever in this code or by other provision of law costs are allowed to a party to an action or other proceeding, such costs shall include the premium on any surety bond which was procured by the party entitled to recover costs in connection with the action or proceeding unless the court determines that the bond was unnecessary."

[3]Government Code section 4207 reads: "The filing of a verified claim is not a condition precedent to the maintenance of an action against the surety or sureties on the contractor's bond. An action on the bond may be maintained separately from and without the filing of an action against the officer or body by whom the contract was awarded.

"Upon the trial of the action, the court shall award to the prevailing party a reasonable attorney's fee, to be taxed as costs, and to be included in the judgment therein rendered."

an item of costs to be included in the judgment. The fact that such item was left out of the judgment, we treat as a clerical error.

The action to recover against Steiny, General and the State was filed April 29, 1964. The bond to release the funds due Steiny held by the State as a result of the stop notice filed by Acoustics was obtained on January 30, 1964, some 89 days prior to the filing of the action by Acoustics.

Acoustics' stop notice, according to its terms, was filed pursuant to section 1192.1 of the Code of Civil Procedure. This section authorizes the State to release funds held pursuant to a claim filed upon the delivery of a surety bond equal to one and one-fourth times the amount of the claim.

Section 1190.1 of the Code of Civil Procedure affords an alternative method of releasing funds held by the State pursuant to a stop notice claim. Subdivision (c) of this section provides for the release of such funds by the contractor filing affidavits disputing the validity of the claim, by the State notifying the claimant of the contractor's dispute of such claim and that unless claimant shall file counteraffidavits within the time specified in the notice, the State will release the funds. The section further provides for the claimant to file counteraffidavits with the State disputing the contractor's affidavits. Upon the filing of such counteraffidavits either the claimant or the contractor may file an action in the superior court for a declaration of their respective rights to the fund. A hearing on the matter must be had by the court within 15 days from the date a motion is made by either party for such hearing. Section 1191.1 of the Code of Civil Procedure also authorizes the release of funds held under a claim filed pursuant to section 1190.1 which is disputed, by the delivery of a surety bond in a sum equal to one and one-fourth times the amount of the claim.

None of the foregoing sections provide that the bond premium incurred by the contractor in obtaining release of funds held as the result of the filing of the stop notice claim shall be recoverable as costs in an action subsequently brought either upon the contract or the bond.

In the case at bench it is reasonably clear that the dispute between Acoustics and Steiny, based upon Acoustics' claim that it had performed work and furnished material on the project for which it was entitled to payment from Steiny, had reached the stage where litigation over such claim was imminent on January 18, 1964, when Acoustics delivered its verified stop notice to the State, and on January 30, 1964, when Steiny delivered the surety bond of Argonaut to release the funds held pursuant to the stop notice. Acoustics' action upon its claim against Steiny and General followed on April 29, 1964. Acoustics' filing of the stop notice had the effect of setting aside the funds as additional security for the payment of its claim, if successful in its action, as effectively as though it had levied a writ of

attachment against such funds after the commencement of its action. The filing of the bond by Steiny accomplished the release of such funds. Had Acoustics delivered to the State its stop notice simultaneously with the filing of its action, or shortly thereafter, and Steiny had caused the release of the funds by the posting of a surety bond, there could be no question that such bond would have been obtained "in connection with the action" as provided by section 1035, Code of Civil Procedure. Under the record here, we are of the opinion that the filing of the stop notice, and the filing of the release bond followed by the filing of the action are so related that it can be said that the release bond was obtained in connection with the action within the meaning of section 1035, Code of Civil Procedure, and, therefore, the premiums paid on such bond by Steiny may be allowed as costs, provided such bond is found to be necessary.

We do not believe that the alternative procedure for the release of funds held pursuant to a stop notice claim provided by section 1190.1, Code of Civil Procedure, that is, by means of affidavits, counteraffidavits and a court proceeding, made it obligatory upon Steiny to adopt such procedure in releasing the funds. Payroll, or accounts payable obligations, or both, could well make it inexpedient for a contractor to adopt such alternative procedure. Furthermore, such procedure, of necessity, contemplates delay in the release of the funds and the employment of counsel in connection therewith.

The allowance by the trial court of the bond premiums constitutes an implied finding that the bond was necessary.. We are not constrained here to reverse this finding.

As heretofore briefly referred to, in action number 837741, Acoustics sued Steiny, General Insurance Company of America and the State alleging in substance in counts 1 and 2 thereof that Steiny had agreed with the State to construct and install the lighting fixtures on the building project; that Steiny had orally agreed with Acoustics that if the latter would perform the layout and furnish the support for such fixtures, Steiny would pay Acoustics the reasonable value of the labor and materials furnished in that connection; that Acoustics had performed its part of the agreement, and Steiny had refused to pay therefor although demand had been made; that the reasonable value of the labor and materials furnished was in the sum of $33,425. The complaint alleged further that in compliance with the provisions of section 1192.1, Code of Civil Procedure, Acoustics had filed with the State a written verified notice to withhold payment to Steiny; that pursuant to said notice the State withheld from the amount payable to Steiny a sum sufficient to pay Acoustics' claim.

Count 3 of the complaint alleges in substance that General Insurance

Company of America had executed and delivered to the State its faithful performance bond in the sum not exceeding $375,000 that Steiny would faithfully perform its obligations under its contract with the State; that Steiny had breached its contract with the State in that it had failed to pay Acoustics for labor and material furnished on the project by Acoustics at Steiny's request; that in compliance with the conditions of the bond, General was liable to Acoustics for the reasonable value of such labor and materials.

Steiny filed its cross-complaint against Acoustics in this action (number 837741) wherein it alleged that it had entered into a written contract with the State in which it had agreed to perform certain electrical work for the State on the subject project; on January 18, 1964, pursuant to such contract the State was indebted to Steiny for a sum in excess of $50,000; at said time, Acoustics, without justification, and with intent to injure Steiny, filed with the State a stop notice, purportedly in accordance with the provisions of section 1192.1, Code of Civil Procedure, directing the State to withhold a sum in excess of $33,425 from funds due Steiny; Steiny demanded that Acoustics withdraw such notice and Acoustics refused such demand; it was necessary for Steiny to employ counsel to seek a judicial determination of Steiny's right to said funds.

The cross-complaint alleged further that as a result of Acoustics' conduct above, Steiny was required to and did secure a bond[4] as a condition precedent to the State paying to Steiny the funds owing to Steiny under its contract with the State.

The cross-complaint alleged further that the conduct of Acoustics was actuated by malice. The prayer of the cross-complaint sought general and punitive damages, attorneys' fees, and costs of suit.

■ If the award of the sum of $1,500 to Steiny in the judgment as costs for reasonable attorneys' fees in defending the action brought by Acoustics may be sustained, it is immaterial whether or not Steiny asked for such fees in its memorandum of costs and disbursements. It would be sufficient to award such fees, tax them as costs and include them in the judgment, if otherwise proper, pursuant to the provisions of section 4207 of the Government Code. (See *Lewis & Queen* v. *S. Edmondson & Sons*, 113 Cal.App.2d 705, 708-709 [248 P.2d 973]; *Wagner* v. *Shapona*, 123 Cal.App.2d 451, 463-464 [267 P.2d 378].)

The record below discloses that the same firm of attorneys which repre-

---

[4]This appears to relate to the bond issued by Argonaut Insurance Company, after the posting of which, the State paid Steiny the money sought to be withheld under the stop order filed by Acoustics and for which Steiny sought to recoup the premiums paid therefor in its memorandum of costs and disbursements.

sented General Insurance Company of America in action number 837741, the pleadings in which consolidated the action on the general faithful performance bond posted by Steiny with the action for alleged breach of contract by Steiny, also represented Steiny in such action. General having prevailed in the action upon the bond, is entitled to reasonable attorneys' fees under the provisions of section 4207 of the Government Code. We find no authority, and none has been cited, which authorizes an award of attorneys' fees to Steiny in defense of the contract action. Therefore, the award of any attorneys' fees to Steiny as costs cannot be sustained, and Steiny's contention that the award of attorneys' fees to it was inadequate becomes moot.

The record discloses further that the same firm of attorneys that represented General in action number 837741 also represented Steiny as cross-defendant under Trepte's cross-complaint in action number 836618. The legal and factual issues in the consolidated actions are substantially the same.

The only issue raised by General in its appeal from the minute order taxing costs is that the allowance to it of the sum of $100 as costs for attorneys' fees is inadequate as a matter of law.

Even when it is considered that the work of preparation and trial in representing Steiny in action number 836618 and action number 837741 would be substantially the same as the work of preparation and trial in representing General in the action upon the bond, we are of the opinion, based upon the record before us, that the allowance of the sum of $100 as attorneys' fees on the bond action is inadequate. Such an award appears to place substantially the entire obligation to pay the attorneys' fees upon Steiny. If one firm of attorneys had represented Steiny on the contract action and another firm of attorneys had represented General upon the bond action, General would have been entitled to recover reasonable attorneys' fees under section 4207 of the Government Code without regard to the allocation of the value of their services, part to the contract action and part to the bond action, as apparently was done by the trial court here. If such actions had been brought separately and different counsel had been employed in each action the same result would follow. It would appear from the record here that a sum not to exceed 50 percent of the overall amount determined as reasonable attorneys' fees would not be improper to award General in the absence of any contractual relationship between Steiny, General and their attorneys. (Cf. *Western Concrete Structures Co.* v. *James I. Barnes Constr. Co.,* 206 Cal.App.2d 1, 8-10 [23 Cal.Rptr. 506].) This is not intended as a directive to the trial court designed to interfere with that court's discretion in fixing reasonable attorneys' fees to be awarded General.

*Disposition*

The judgment awarding damages to Trepte Construction Co., Inc., and against the State of California in the sum of $7,000, and costs, in action number 836618 is reversed.

That portion of the minute order taxing costs wherein the sum of $1,500 as attorneys' fees is allowed to Steiny & Mitchell, Inc., as costs against Acoustics, Inc., is reversed. That portion of the minute order taxing costs wherein the sum of $100 is allowed to General Insurance Company of America as attorneys' fees in defense of the action on the bond is reversed with directions to the trial court to redetermine the amount of reasonable attorneys' fees to which General Insurance Company of America is entitled in accordance with the views herein expressed.

The judgment is affirmed in all other respects.

Department of Public Works of the State of California to have and recover its costs on appeal from Trepte Construction Co., Inc., Acoustics, Inc., and Steiny & Mitchell, Inc., each to bear its costs on appeal. General Insurance Company of America to have and recover its costs on appeal against Acoustics, Inc.

Kaus, P. J., and Reppy, J., concurred.