[Civ. No. 48784. Second Dist., Div. Three. May 17, 1977.]

ZURN ENGINEERS, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA ex rel. DEPARTMENT OF WATER
RESOURCES, Defendant and Appellant.

800

**COUNSEL**

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, and Henry G. Ullerich, Deputy Attorney General, for Defendant and Appellant.

Monteleone & McCrory, Darrell P. McCrory, G. Robert Hale and Patrick J. Duffy for Plaintiff and Respondent.

## OPINION

LORING, J.*—Plaintiff-respondent Zurn Engineers, a California corporation, formerly known as Pascal & Ludwig, Inc. (Contractor) recovered judgment after a nonjury trial against defendant-appellant State of California, acting by and through its Department of Water Resources (State), in the aggregate sum of $896,245.89 with interest at 7 percent per annum from December 21, 1967, on four causes of action which arose out of the alleged breach of a contract for the construction of the Grizzly Valley Dam (Dam) in Plumas County, California.[1] Contractor's complaint as amended alleged 12 causes of action for "extra" work aggregating $1,238,275.31. The contract contained provisions authorizing the State Engineer, or his designated representative,[2] to decide disputes including claims for extra compensation between Contractor and State and making his decision "Final and conclusive unless it is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith. Contractor filed 27 claims for extra compensation on which it was awarded $127,297.68. The trial court, disregarding the decision of the Engineer, tried the case de novo; that is, the court received original evidence bearing upon the Contractor's claims for extras and made findings that State had made certain representations to Contractor which were untrue which caused damage to Contractor, and rendered judgment accordingly in favor of Contractor on the first four causes of action. The trial court rendered judgment in favor of State on the last eight causes of action. State appeals from the judgment in favor of Contractor on the first four causes of action but Contractor does not appeal from the judgment in favor of State on the last eight causes of action. We will, therefore, affirm the judgment in favor of State on the eight causes of action and treat the case as if it originally contained only the four causes of action on which this appeal is based.

### PRELIMINARY FACTS

Commencing at least as early as 1954, State began to formulate plans for the construction of Dam. Periodically topographic surveys and maps

---

*Assigned by the Chairman of the Judicial Council.

[1]The Grizzly Valley Dam, which is a part of the Feather River Project, is an earth-filled gravity type dam in an arch configuration, the embankment (fill) of which is 115 feet high with a crest 800 feet long, impounding 83,000-acre feet of water, in a storage area of 4,000 acres with a shore line of 32 miles which was built at an elevation of approximately 5,700 feet above sea level.

[2]Hereafter we use the term "Engineer" to include his designated representative.

and geologic studies were made of the proposed site and some rotary core drilling was performed. By June of 1964, plans and specifications were prepared and the project was let for public bidding at unit prices for 66 different items of work. Many of the 66 items of work were for a specific quantity measured in terms of cubic feet, linear feet, pounds, tons or barrels. At the end of the 66 items, State included the following caveat: "The foregoing quantities are approximate only, being given as a basis for the comparison of bids and the Department of Water Resources does not, expressly or by implication, agree that the actual amount of work will correspond therewith, but reserves the right to increase or decrease the amount of any class or portion of the work, or to omit portions of the work, as may be deemed necessary or advisable by the Engineer."

Contractor was the low bidder at an aggregate price of $1,833,131 based on State's quantity estimates. The project included a 700-foot, 36-inch diameter outlet conduit constructed of steel pipe embedded in concrete under the embankment with upstream intake tower and downstream control valves (which was designed to allow drainage of water from the reservoir) and a concrete overflow chute-type spillway to accommodate any excess flow of water. The embankment of the Dam was composed of a core of impervious earth (Zone 1 material) against which gravel was banked upstream (Zone 2 material), against which sand and gravel were banked at a uniform width, both upstream and downstream (Zone 4 material), against which was banked a rock shell of larger rocks, both upstream and downstream (Zone 3 material). The base of the Dam was approximately 250 feet wide sloping to a crest 30 feet wide. Zone 1, 2 and 3 material was tapered from bottom to top. Each zone of material was to be laid and compacted concurrently. The upstream slope of the embankment was at a ratio of 2.5:1 and the downstream slope of the embankment at a ratio of 2:1. The project also included the construction of a road over the crest of the Dam and the relocation of certain roads around the reservoir. The reservoir area had to be grubbed and cleared. The plans included a map of the damsite and borrow pit locations for the excavation or quarrying of Zones 1, 2, 3 and 4 material.

State contemplated that the damsite area would be cleared of overburden and decomposed rock and excavated to a point where "moderately weathered" rock was reached, both for the outlet conduit and the foundation for the Dam embankment. State had used its

preliminary topographic surveys (both aerial and on the ground) and geologic studies including cored rotary drillings, auger holes and backhoe trenches for the purpose of preparing its design studies and plans and specifications. The drawings attached to the specifications included a map designating the location of the auger holes, cored rotary drilling holes and back hoe trenchings. The request for bids advised all prospective bidders that the surveys, geologic studies and reports and core samples were available for inspection on request at the Sacramento office. State calculated that the desired type of subsurface would be reached after a certain amount of excavation and computed its estimated quantities for various items of work accordingly. However, the desired type of subsurface was not reached after excavation within State's estimates. For example, State calculated that the project would require the removal of 33,000 yards of material in order to place the embankment of the Dam, whereas 64,724 cubic yards of material were ultimately excavated; State estimated 5,400 yards of material would have to be removed in order to build the outlet conduit whereas 7,709 cubic yards were ultimately removed; State estimated the project would require 160,000 cubic yards of excavation for roadways whereas 190,498 cubic yards were ultimately removed. State estimated that 700 cubic yards of specially compacted material would be required whereas 2,129 cubic yards were ultimately required. Because of the increase in the quantities of the various items of work, State ultimately paid Contractor $2,269,382.05 based on actual quantities multiplied by the unit bid prices and approved change orders.

The contract required Contractor to complete the project by November 15, 1966, and contained a liquidated damage clause of $500 per day for each day that completion was delayed. Contractor was notified to begin work on October 20, 1964. Under the contract, Contractor was authorized to arrange its schedule of work in any sequence which it desired in order to complete the work on schedule. Contractor completed the work on September 29, 1967. State extended the completion date from time to time for various periods for various reasons.

The contract provided that if the work to be performed was unclear, the Contractor should apply to the State Engineer for clarification,[3] and

---

[3]Section 2 and section 9, articles (a), (c), (d) and (e) of the contract read in part:
"SECTION 2. COORDINATION AND INTERPRETATIONS OF SPECIFICATIONS
AND DRAWINGS
"The standard provisions, special provisions, technical provisions, drawings, contract change orders, and all supplementary documents are essential parts of the contract, and a

the Engineer's decision would be final. The contract documents also provided that the State's calculations of quantities were "estimates only" and actual quantities might vary and that such variations would not be

requirement occurring in one is as binding as though occurring in all. They are intended to be complementary and to describe and provide for a complete work. In case of conflict, the following shall be the rules of interpretation:

"Drawings shall govern over the standard provisions; the special provisions shall govern over both the standard provisions and the drawings; the technical provisions shall govern over the special provisions, the standard provisions and the drawings.

"Detail drawings shall govern over general drawings. Figures written on drawings shall govern over the drawings themselves.

"Should it appear that the work to be done or any of the matters relative thereto are not sufficiently detailed or explained in the contract, the Contractor shall apply in writing to the Engineer for such further explanations as may be necessary and shall conform to them as part of the contract. In the event of any doubt or question arising respecting the true meaning of the standard provisions, special provisions, technical provisions or the drawings, reference shall be made in writing to the Engineer, whose decision shall be final.

. . . .

"(b) Approximate Estimate.—The quantities given in the notice to contractors, proposal and contract forms are approximate only, being given as a basis for the comparison of bids, and *the Department of Water Resources does not, expressly or by implication, agree that the actual amount of work will correspond therewith, but reserves the right to increase or decrease the amount of any class or portion of the work, or to omit portions of the work, as may be deemed necessary or advisable by the Engineer.* (Italics ours.)

"(c) Examination of Drawings, Specifications, and Site of Work.—The bidder shall examine carefully the site of the work contemplated and the proposal, drawings, specifications, and contract forms therefor. The submission of a bid will be conclusive evidence that the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality, and quantities of work to be performed and materials to be furnished, the difficulties to be encountered, and to the requirements of the proposal, drawings, specifications and other contract documents.

"Where investigation of subsurface conditions has been made by the Department in respect to foundation or other design, bidders may inspect the records of the Department as to such investigation, including examination of samples and drill cores, if any. When logs of test borings showing a record of the data obtained by the Department's investigation of subsurface conditions are made available, said logs represent only the opinion of the Department as to the character of material encountered by it in its test borings and are made available only for the convenience of bidders.

"Investigations of subsurface conditions are made for the purpose of design, and the Department assumes no responsibility whatever in respect to the sufficiency or accuracy of borings or of the log of test borings or other preliminary investigations, or of the interpretation thereof, and there is no guarantee, either expressed or implied, that the conditions indicated are representative of those existing throughout the work, or any part of it, or that unforeseen developments may not occur.

"Making such information available to bidders is not to be construed in any way as a waiver of the provisions of the first paragraph of this Article and bidders must satisfy themselves through their own investigations as to conditions to be encountered.

"No information derived from such inspection of records of preliminary investigations made by the Department or from the Engineer or from his assistants or from the maps, specifications, profiles or drawings will in any way relieve the Contractor from any risk

"changes" within the definitions of the contract.[4] The contract provided for change orders to accomplish any changes in the work and provided that Contractor would not be paid for changes without an authorized change order.[5] The contract provided that the contract price would be

---

or from properly fulfilling all the terms of the contract. Records of such preliminary investigations as may have been made by the Department may be inspected at the office of the Department, 1320 K Street, Sacramento, California, or at such other locations as may be stated in the notice to contractors.

SECTION 9. CONTROL OF WORK

"(a) Authority of Engineer.—The Engineer shall decide all questions which may arise as to the quality or acceptability of materials furnished and work performed and as to the manner of performance and rate of progress of the work; all questions which may arise as to the interpretation of the drawings and specifications; all questions as to the acceptable fulfillment of the contract on the part of the Contractor; and all questions as to compensation. He shall have authority to enforce and make effective such decisions and orders which the Contractor fails to carry out promptly.

"      .      .      .      .      .      .      .      .      .      .      .      .

"(c) Drawings and Data to be Furnished by the Department.—The Department may issue supplemental drawings for the construction work under the contract. These drawings will show additional details as required for construction purposes. Installation instructions for Department furnished materials will be furnished if required.

"(d) Conformity with Drawings and Allowable Deviations.—Finished work in all cases shall conform with the lines, grades, cross-sections, and dimensions shown on the approved drawings furnished by the Department. Deviations from the drawings as may be required by the exigencies of construction will be determined by the Engineer.

"(e) Interpretation of Drawings and Specifications.—Should it appear that the work to be done or any of the matters relative thereto are not sufficiently detailed or explained in the specifications, the Contractor shall apply to the Engineer for such further explanations as may be necessary and shall conform to them as part of the contract. Any questions regarding the true meaning of the specifications shall be directed to, and decided by the Engineer."

[4] Section 5(c)(1) of the contract reads:

"(c) Changes.—

"(1) General.—The Department may make changes in the drawings and specifications providing for increases or decreases in the quantities of work to be done under the contract, for the performance of such extra work and the furnishing of materials therefor as the Department requires for the proper completion or construction of the whole work contemplated, for extensions of the time of completion of the work, or for such other alterations in the work as the Engineer deems necessary and proper. Extra work consists of new and unforeseen work determined by the Engineer not to be covered by any of the various items for which there is a bid price or by combinations of such items.

"*All quantities stated in the contract for unit price items of work are estimates only, and actual measured quantities of such work will vary from such estimated quantities. Such variations are not changes within the scope and meaning of this contract, and shall be adjusted for payment purposes in the monthly and final estimates of work done provided for in Section 8, Articles (d) and (e).*" (Italics ours.)

[5] Section 5(c)(2) of the contract reads:

"(2) Change Orders.—Each change will be set forth in a change order approved by the Engineer, specifying: (a) all additional work to be done and work to be omitted, if any, in connection with the change; (b) the basis of compensation to the Contractor for additional or omitted work; and (c) any adjustment of the time of completion of the work. If the Engineer determines that a change requiring additional work will cause

changed for the portion of work determined to be materially changed[6] and required Contractor to give 15 days advance notice of any changes which Contractor intended to use as the basis for any potential claim followed by a detailed claim within 60 days after the notice of potential claim.[7] The contract provided that State's Engineer should decide all of Contractor's claims for extra compensation "and his decision shall be

---

delay in completion of the work, he shall, either in the change order requiring the additional work, or in a subsequent change order issued at such time as the extent of such delay can be determined, extend the time of completion by the number of days he determines to be equitable.

"Upon receipt of a change order, the Contractor shall comply therewith and perform each item of work set forth therein, furnishing all labor, material and equipment necessary therefor, in the same manner as if such work were originally included in the contract. If ordered in writing by the Engineer, the Contractor shall proceed with changes prior to actual receipt of a change order therefor. In the absence of a change order or other written order of the Engineer for changes, the Contractor shall not be entitled to payment or an extension of the time of completion on account of any changes made."

[6]Section 5(c)(3) of the contract reads:

"(3) Adjustment of Contract Price.—When a change increases or decreases the quantity of an item of work to be done under the contract, payment shall be made for the quantity of said item of work performed at the contract unit price therefor; provided that if such change is determined by the Engineer to materially change the quantity or character of said item of work from that on which the Contractor based his bid price, payment may be made for the portion of said item of work determined to be materially changed as agreed upon in writing by the Engineer and the Contractor, or, at the option of the Engineer, on the basis of force account, as provided in Section 8, Article (b).

"When a change requires the performance of extra work, or alters the work other than by increase or decrease of quantities of work to be done, payment for such extra or altered work shall be made as agreed upon in writing by the Engineer and the Contractor or, at the option of the Engineer, on the basis of force account, as provided in Section 8, Article (b)."

[7]Section 5(d), (e) and (f) of the contract read in part:

"(d) Changed Conditions.—The Contractor shall promptly, and before such conditions are disturbed, notify the Engineer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those represented in this contract; and (2) unknown physical conditions at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this contract. On receipt of such notice, the Engineer shall promptly investigate the conditions. If the Engineer finds that the conditions are as described in (1) or (2) above, and that they will cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, he shall issue an appropriate change order subject to the provisions of Article (c) of this Section. If the Engineer, after investigation of the conditions, finds that a change order is not justified, he shall so notify the Contractor in writing. Should the Contractor disagree with such finding, he may submit a notice of potential claim to the Engineer as provided in Article (e) of this Section.

"The Engineer shall not investigate any claimed changed conditions unless the Contractor has given notice thereof as above required, and failure to give such notice shall constitute a waiver of any claims arising out of such conditions.

"(e) Notice of Potential Claim.—Should the Contractor disagree with a change order issued under Article (c) of this Section, or with a notification issued under Article (d) of

final and conclusive unless it is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith."[8]

The parties agree that Contractor complied with all contractual prerequisites to the assertion of the various claims. State's Engineer approved Contractor's various claims for extra work (discussed in more detail, *infra*) in the aggregate sum of $125,142.18. State provided an administrative process for review of the Engineer's decision which Contractor pursued. On review the Deputy Director of the State Water Project (Alfred R. Golzé) on recommendation of a three man appeals board made minor changes in the Engineer's decisions and approved Contractor's various claims (discussed in more detail, *infra*) in the aggregate sum of $127,297.68. Being dissatisfied with this award Contractor filed an action in the superior court for $1,238,275.31. Additional detailed facts will be discussed in correlation with the specific causes of action and assignments of error.

---

this Section or under Article (e) of Section 7, or with any other demand, ruling, decision, instruction, or act or omission of the Engineer, he may, within 15 days after receipt or occurrence of the same, as the case may be, submit to the Engineer a written notice of potential claim stating clearly and in detail his objections thereto. Such notice shall indicate, in so far as possible, the nature and amount of any adjustment in contract compensation or time which the Contractor believes will or may be due.

"Each change order, notification, demand, ruling, decision, instruction, or act or omission of the Engineer shall be final and conclusive if the Contractor fails to submit a notice of potential claim with respect thereto in the manner and within the time above stated, and such failure shall constitute a waiver of all claims in connection therewith.

"(f) Claims.—Not later than 60 days following the submission of a notice of potential claim in accordance with Article (e) of this Section, the Contractor may submit to the Engineer his claim concerning the matter so noticed. Where a claim relates to compensation, it shall set forth clearly and in detail the reasons why the Contractor believes that additional compensation is due, and the nature and amount of the costs involved. Where a claim relates to the time of completion of the work, it shall set forth clearly and in detail the reasons why the Contractor believes an extension of time is due, and the number of days involved. Claims shall include references to applicable provisions of the specifications, the methods of computing such adjustments in contract compensation and time as are alleged to be due, and all other pertinent factual data. It shall be the responsibility of the Contractor to furnish such further information and data as may be requested in writing by the Engineer within the time specified in such request, and failure to furnish same within the time specified shall be cause for denying the claim."

[8]Section 5, article (f) of the contract also provides in part: "Subject to the preceding paragraph of this Article, the Engineer shall decide all claims arising under and by virtue of the contract, and his decision shall be final and conclusive unless it is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith. The Engineer shall advise the Contractor of administrative procedures for the consideration and determination of claims, and the Contractor shall comply therewith. Claims shall be processed promptly following their submission, unless circumstances exist which, in the judgment of the Engineer, make it advisable to defer their consideration and determination until a later time."

DETAILED FACTS AS RELATED TO
THE FOUR SPECIFIC CLAIMS

*The Outlet Conduit (First Cause of Action)*[9]

The plans and specifications provided that Contractor would excavate the area for the outlet conduit to moderately weathered rock, level up the bottom of the trench with backfill concrete, lay the pipe, wood form the sides of the trench where necessary to hold the concrete that would encase the pipe, pour the concrete, remove the forms and cover the pipe. The excavation was covered by item 5 of the contract: "5400 cubic yards of excavation for outlet works." Item 23 was "1,100 cubic yards of concrete in outlet works." Item 32 was "outlet conduit metalwork." Contractor bid $7 per cubic yard on item 23; and a lump sum of $60,000 on item 32. Other items of the contract also applied to the outlet conduit: item 17 "Specially compacted material," item 21 "Furnishing and handling cement," item 22 "Furnishing and handling Pozzolan," and item 26 "Concrete in backfill and grout cap." State contemplated that the first 100 feet of the outlet conduit would be wood framed and the remaining 600 feet would be in rock sufficiently hard so that the walls of the trench would serve as forms for the concrete which would encase the pipe and that excavation would not be required beyond the 5 feet × 4 feet dimensions of the concrete which would encase the 36-inch steel pipe. However, because of the poor quality of the rock as actually excavated the outlet conduit trench had to be dug to a greater depth and width than contemplated so that most of the trench had to be wood formed, since the walls of the trench were not sufficiently stable to serve as forms for the concrete. Section 15, subdivision (f), of the specifications entitled "Excavation for Dam Embankment and Cutoff Trench" read in part: "The entire area to be occupied by the foundation of the dam shall be stripped to moderately weathered rock *as directed.*" (Italics ours.)

State issued revised drawings to cover the increased excavation and issued change order 12 to compensate Contractor for the extra work performed, allowing $23,275 for extra wood forming. Extra excavation and extra concrete were to be paid for at the unit prices bid, multiplied

---

[9]We consider Contractor's claims by cause of action number, rather than claim number, because as initially presented to State there was a certain amount of duplication, overlapping, amendment and rearrangement in the various claims which totalled 27 claims by different numbers.

by quantities which aggregated an additional $66,734. State reserved the right to fix additional time allowed, if any, at a future date. Contractor claimed that its total costs for extra work on the outlet conduit was $55,088.42, but State only paid Contractor a total of $32,231.50 for work not covered by unit prices resulting in alleged damages or loss in the sum of $22,856.92. Contractor also claimed a delay of 16 weeks in the work schedule with the result that equipment brought in to excavate for the embankment foundation remained idle for three months. Contractor claimed that the stream had to be rediverted not only in 1965 but also in 1966. State ultimately allowed a 20-day time extension. There was evidence available to State's Engineer that before State issued change order 12, Contractor's personnel advised State's personnel that the additional excavation and additional concrete required on the outlet conduit "could be accomplished at contract prices; those prices were considered to be fair and reasonable work imposed by the change in outlet conduit excavation conditions; and a change order was not considered necessary." In a letter dated October 13, 1966 (almost a year after the additional excavation problem was first encountered) Contractor advised State "that he would accept $23,275 and the granting of a 14 working day extension as complete compensation in time and money for the extra form work required on the outlet conduit and inclined intake structure." It was then that State first issued change order 12 and delivered it to Contractor on December 20, 1966.

As first written C.O. 12 allowed $23,275 and 14 days delay. On December 23, 1966, Contractor refused to sign C.O. 12. State rewrote C.O. 12 and resubmitted it to Contractor on October 20, 1967. As rewritten C.O. 12 allowed Contractor the same $23,275 for extra wood forming work but reserved the right to fix the additional time extension to a future date. Contractor accepted the revised C.O. 12 on October 27, 1967.

With reference to the matter of time extension for the excavation for the outlet conduit work, Contractor's original work schedule indicated that 5.4 weeks would be required to complete the work. State estimated that as originally designed it would require 12.5 weeks to accomplish the outlet conduit excavation, forming, concrete implacement and back filling. Contractor actually required 15.4 weeks to complete the work. State allowed only an additional 20 days, apparently refusing to allow additional time because of Contractor's own erroneous initial estimate of the time required.

One of Contractor's elements of additional cost of excavating the trench for the outlet conduit was for hand labor. State's Engineer, after investigation, concluded that the original specifications contemplated the use of hand labor for the final clean-up of the outlet conduit trench and "The contractor has made no showing, and nothing has been found to support [the claim] that the change implemented by the revised drawings increased the amount of hand labor beyond that required by the specifications. The change should have in fact had the opposite effect in that the extensive clean up required for surfaces against which concrete was to be placed, was not required in the areas where the concrete was placed in forms." After investigation the State concluded that it was necessary to redivert the stream a second time during 1966, not because of delay due to unexpected foundation conditions, (as claimed by Contractor), but because Contractor improperly and in violation of instructions diverted the stream during the winter of 1965-66 through the outlet conduit which damaged the outlet conduit requiring a second rediverting of the stream during the construction season of 1966. No portion of Contractor's claim for this item of costs was allowed by State. State's Engineer allowed Contractor $2,067.24 for idle equipment, made idle for the extra time required to perform the extra excavation. State's Engineer initially allowed Contractor an additional $7,344.46 for increased excavation which was computed on the basis of an additional $1.57 times 4,678 cubic yards above the unit bid price of $7 per cubic yard. The record is unclear as to the basis for the allowance of $1.57 per cubic yard above the unit bid price. This allowance was ultimately disallowed by State as a result of the review process. The trial court awarded judgment in favor of Contractor on this cause of action in the sum of $28,249.36 with interest.

*Projecting Rocks and Test Pads (Second Cause of Action)*

Section 15, article (f), of the specifications relating to the foundation for the Dam abutment provided in part that "all overhanging rock shall be broken down to eliminate any overhangs. . . . [¶] All loose rock and all projecting rock surfaces shall be removed to the foundation level *as directed. . . . Methods employed for the removal of projecting rock surfaces shall be such that the rock remaining in place is not disturbed."* (Italics ours.) Section 17, article (d) relating to "Preparation of Foundation Embankment" provided in part:

"(1) General.—No material shall be placed in any section of the dam embankment until the foundation for that section has been excavated to conform to the requirements of Section 15. Immediately prior to placing the earthfill, the surface of the foundation shall be free of standing water and sufficiently clean to obtain a suitable bond with the earthfill. Excavated surfaces shall be properly moistened where directed.

"(2) Excavated Surfaces.—After the stripping and excavation of the embankment foundations and after excavation of the cutoff trench to the established lines and before the placing of any embankment material, surfaces of excavations shall be treated as follows:

"In the foundation area outside the limits of the cutoff trench, all loose material shall be removed to the extent necessary to expose firm undisturbed material and the surface left clean for the specified successive treatment or the placement of material thereon.

"In the cutoff trench, all surfaces including the side slopes shall be cleaned thoroughly by brooming and with high velocity air-water jets as directed before any embankment is placed. As embankment operations progress, foundation surfaces shall be recleaned by the high velocity air-water jets immediately ahead of the embankment placement. Any fissures, seams, and shear zones shall be filled flush with the adjacent foundation surfaces with Zone 1 material, and specially compacted as specified in this Section; where inaccessible to such compaction methods, such crevices shall be filled with backfill concrete.

"All concrete shall conform to the requirements of Sections 19 and 20."

The specifications provided in detail how each zone of material should be laid out and how it should be compacted. Section 17, subparagraph (3), dealing with the compaction of the Dam embankment provided in part: "(3) Special Compaction of Zone 1, Zone 2, and Zone 4 Material.—Where foundation areas are inaccessible to the regular compaction equipment and in designated areas of the spillway and outlet works the embankment shall be compacted by special compaction

methods. Unless shown otherwise, material to be specially compacted shall conform to the gradation requirements of the Material of the zone in which it occurs."

A special typewritten paragraph deleted a printed sentence from paragraph section 17, article (g), reading: "Tractors and other heavy equipment shall not be used within 4 feet of concrete structures" and replaced it with a sentence reading: "Tractors and other heavy equipment shall not be used in areas for which special compaction is designated and shall not be used within 18 inches of concrete structures when limits of special compaction are not shown."

As the work of excavating the foundation for the embankment progressed, a difference of opinion arose between Contractor and Engineer over whether or not hard rock should be removed from the floor of the foundation if it was necessary to do so to excavate to a uniform grade. Apparently the controversy revolved around the contract provision for elimination of "overhanging rock" and "projecting rock." The Engineer interpreted those words as relating to projecting or overhanging rock on the *sides* of the embankment. The Contractor contended that the specifications also included the *floor* of the embankment. The Engineer did not want solid rock on the floor of the embankment removed just for the purpose of creating a floor which was at a precisely uniform grade. The Contractor claimed that if hard rock was not removed to a uniform grade, so that the floor was of uniform grade, it could not use its mechanical compaction equipment, but would be required to hand compact the Zone 1 material around the uneven rocks until the floor of the foundation was built up to a point where mechanical compaction equipment could be used. The Engineer concluded that it was engineeringly unsound to remove hard rock in place and replace it with compacted material, however compacted, since compacted material would never be as satisfactory as hard rock in a natural state. State's expert, Mr. Korhonen, testified at trial that "projecting rocks" meant rocks which had an overhang nature so that if material were placed on the rock, and there was settlement, a void would be created (underneath the overhang) such as would create a seepage problem; a "projecting rock" was the equivalent of an "overhanging rock"; and protruding rock was not a projecting rock; a protruding rock was one that merely rose in relation to the surrounding or adjacent rock.

Contractor submitted various claims (admittedly often overlapping) for costs incurred and extensions of time required as the result of the excavation of additional quantities and increased hand compaction in the foundation for the Dam embankment. Engineer, after investigation of the field condition, Contractor's data and the contract specifications, concluded that under the contract Contractor was required and expected to excavate as directed by Engineer and compact as directed by Engineer, that such work is normal in dam construction, that the only difference was in the quantity of the work which was paid for at unit prices, so that Contractor was not entitled to be paid on any claim for extra work in this regard except in connection with Contractor's claim for costs of "accelleration" (claim No. 11),[10] i.e., suing more manpower and additional equipment which was required to handle increased quantities within the same time schedule.

As part of the same overall problem, regarding removal of projecting rocks, Contractor asserted a claim for extra compensation and time in the construction of "test pads." Section 17 of the contract contained detailed requirements regarding the type of compaction equipment which could be used and the manner of operation. This type of contract requirement is called the "method type" rather than the "result type" of specification. It is used because the capacity of designated equipment is generally well known. Section 17 provided in part: "Material shall be placed in layers not to exceed 3 inches in thickness after compaction, brought to suitable moisture content and compacted to a density equal to that outside the area of special compaction in that zone. Surfaces of specially compacted material shall be prepared by light scarifying and, if necessary, moisture added to ensure complete bonding between such surfaces and the successive material to be placed thereon."

Engineer attempted to achieve compaction of Zones 1 and 2 material to 95 percent density. Contractor's witness Collins testified that: "There was no special percentage of compaction on the job." While we cannot find any provision of the contract (and none is cited by counsel) which requires a specific amount or percentage of density (except the foregoing phrase "to a density equal to that outside the area of special compaction in that zone"), the contract is clear that the compaction operation should be conducted "as directed" by the Engineer. Subdivision (h) of section

---

[10]Claim No. 11 is the third cause of action discussed *infra.*

17 reads: "(h) Adjusted Roller Compaction.—If it is found desirable to roll each layer of Zone 1 and Zone 2 material with more or less than 12 roller passes to obtain the desired compaction, the number of roller passes shall be changed as directed by the Engineer."

Subdivision (i) of section 17 provided that Engineer should conduct tests to determine compaction density and requirements. It reads:

"(i) Material Tests.—The Engineer will take soils samples and perform moisture content and gradation tests.

"The Engineer will in addition, conduct density and other tests on the fill and related laboratory testing. *Tests will be made as frequently as the Engineer will consider necessary.*

"The Contractor shall remove surface material and render such assistance as necessary to enable sampling and testing. The Contractor shall take such precautions as necessary to protect Department personnel while they are performing testing operations on the dam embankment.

"Description of the test methods used by the Department are contained in the 'Department of Water Resources Manual of Testing Procedures for Soils.' Tests will be conducted with the equipment and in accordance with the procedures described therein." (Italics ours.)

During the course of the work, Engineer concluded that Contractor was not achieving the desired compaction. Engineer found that Contractor's sheepsfoot equipment was below minimum standards. Contractor requested permission to use a Pactor 340 on Zones 1 and 2 material rather than a sheepsfoot. The Pactor 340 was not a machine authorized under the contract. The Pactor 340 was apparently a new or unusual type of machine and Engineer was not familiar with its capabilities. Engineer requested Contractor to construct test pads to demonstrate the compaction capabilities of the Pactor 340. After extensive testing on the test pads, Engineer refused to approve the use of the Pactor 340 machine, because it would not achieve the desired result. Engineer required

Contractor to bring its sheepsfoot equipment up to standard after which Contractor was able to achieve the 95 percent compaction density desired. The trial court rendered judgment in favor of Contractor for $96,206.14 with interest on this cause of action.

*Zone 3 Quarry (Fourth Cause of Action)*[11]

The contract required Contractor to obtain Zones 1, 2, 3 and 4 material which was to be used in the Dam from borrow (quarry) sites designated on the plans (D-quarry) or from suitable material which had to be excavated from the roads or outlet works sites.[12] The contract also specified the manner (slope, depth, grades, etc.), in which the various materials could be quarried from the various borrow pits. The limits of the area of operation were fixed by the United States Forestry Service. State's Zone 3 D-quarry report stated that core holes had penetrated approximately 50 feet of potential Zone 3 material at the Zone 3 D-quarry site, and as a result the geologists were of the opinion that there was a 20-foot overburden of decomposed rock and that approximately 113,700 cubic yards of material could be produced (after removal of an overburden of approximately 29,800 cubic yards) which would probably break down quarrying into sizes and quantities required for Zone 3 material. The report indicated that some portions of the overburden could probably be used as Zone 2 material.

However, Contractor claimed that when it attempted to produce Zone 3 material from the D-quarry, it became convinced that it could not produce the required amount of Zone 3 material from the D-quarry within benching, grading and excavation limitations specified, and Contractor requested State to designate an alternate quarry site for Zone 3 material. Contractor suggested an alternate site (A-quarry—sometimes referred to as the Andsite quarry) which was approved by State by letter, which State requested Contractor to sign and approve. Contractor

---

[11]We discuss the third cause of action, *infra,* because it is at least in part a summary of the first, second and fourth causes of action.

[12]With reference to Zone 3 material, section 17, article (c)(3) provided: "Zone 3 material—material for Zone 3 embankment shall be obtained from the Zone 3 quarry area or from stockpiles of suitable material taken from the outlet works and dam foundation excavation and shall consist of a suitable mixture of hard, dense, rock fragments up to 1 cubic yard in volume with not more than ten percent passing a number 4 screen."

refused because it appeared economically impractical. Contractor started laying Zone 3 material about the middle of July, 1966. Contractor obtained some of this Zone 3 material from material which had been excavated from the Control Structure Access road excavation and the A-quarry. The A-quarry ran out of Zone 3 material by the 7th of September, 1966. On September 13, 1966, Contractor started stripping the overburden from D-quarry. By September 20, Contractor was obtaining rock from D-quarry and by October 15, the rock was so hard blasting was required. On September 29, 1966, Contractor first requested State to enlarge the boundaries of D-quarry. In October State enlarged the area for D-quarry. Contractor's records indicate that it did not begin to strip the D-quarry of overburden until about August of 1966 and then it did so only periodically. Stripping began in earnest about September 20, 1966. By September 20, 1966, about 32,000 cubic yards of Zone 3 material had been laid in the Dam embankment from sources other than D-quarry. Contractor's geologist admitted that State's geological report of D-quarry was substantiated by the cores. When Contractor calculated its unit price bid it did not calculate the cost of stripping 33,000 cubic yards of overburden from D-quarry or A-quarry but the cost was included in the unit bid. Before bidding, Contractor did not inspect State's geologic studies or core samples from D-quarry. State's geologist (Gross) was of the opinion that about 50 percent of the material which Contractor excavated from D-quarry and transported to the waste pile was material which was suitable for Zone 3 material, and that at the edges of the waste pile about 50 percent of the material was rock. The State's Engineer was of the opinion that 50 percent of usable Zone 3 material was wasted by Contractor because Contractor did not employ a screening or sorting operation at that time. State's geologist was also of the opinion that Contractor did not properly cut the banks of D-quarry in that it failed to steepen the cut slope when moderately weathered rock was encountered and Contractor did not avail itself of the large quantity of rocks in the West-Northwest end of D-quarry. Contractor's geologist agreed that the West-Northwest end of D-quarry (upstream side) contained good rock. State's geologist was of the opinion that the geologic conditions encountered in D-quarry were no different than the preliminary reports and core samples had indicated would be encountered. Baer, one of State's engineers, testified that no one had set the stakes for the D-quarry until September 1966, and that slope stakes were set on September 30, 1966 which had not been done previously because no one requested it. There was a conflict of evidence on this point. The North limit stakes for D-quarry were also set on September 30, 1966.

There was evidence that during the meetings between State's and Contractor's personnel, Contractor's geologist (Dr. Slauson) stated that State's geological data was accurate and excellent. Contractor claimed that because the amount of Zone 3 material in D-quarry was less than originally anticipated, and it had to use Zone 3 material from other sources, it had incurred additional costs as the result of a changed condition. Contractor also claimed that State had unduly restricted and controlled its scope and manner of operation by staking and directions regarding the cutting of slopes. Article 12(m)(4) of the contract required that bank slopes in the quarry should be at a ratio of ¼:1 in solid rock, ½:1 in decomposed granite with benches 10 feet wide on each 20-foot contour in elevation. Bank slopes in overburden could be at a ratio of 2:1. Article 15(i) of the contract provided that "Areas to be stripped and the extent of stripping shall be *as directed.*" (Italics ours.) By its claim number 12, Contractor sought $513,043.82 for extra costs in excavating Zone 3 material and by claim 12A sought an additional $96,650.67 for idle equipment. Contractor sought an additional 50 days in time extension. Engineer concluded that "changed conditions" as defined in the contract did not exist with reference to Zone 3 material; that State did not misrepresent subsurface or physical conditions at the Zone 3 D-quarry site; that stakings of the quarry site were done by mutual agreement between State and Contractor, which did not constitute directions by State to Contractor with respect to Contractor's development of the quarry; and that "apparent management problems had contributed greatly to Contractor's lack of efficiency and organization." Engineer denied the claim in its entirety, except Engineer did not consider the claim for 50 days extension and idle equipment because Contractor had included those items in other claims, notably claim 11 (Third Cause of Action). On review the Claims Appeal Board concluded that Contractor's initial development of D-quarry "was restricted by Contractor's other extraneous activities at the quarry site and not by any staking or other actions by the department." The appeal board found that State had set stakes at D-quarry site "at the request of the Contractor and to facilitate his operations." The appeal board concluded that Contractor's self-imposed limitations on overburden stripping and excavation at D-quarry did not demonstrate that sufficient suitable Zone 3 material could not be produced from D-quarry in the quantity and quality predicted in State's geology report and as contemplated by the specifications. The trial court rendered judgment in favor of Contractor for $552,478.15 with interest on this cause of action.

*Acceleration—(Third Cause of Action)*

Under the contract, Contractor was required to complete the project by November 15, 1966, with liquidated damages fixed at $500 for each day of delay. Contractor was permitted to establish its own time schedule and sequence of operations within the specified time. The contract provided that "delays due to unforeseen causes within the meaning of this Article shall not entitle Contractor to additional compensation under the contract" but changes in the work requiring added time were to be the basis of a time extension incorporated in change orders.

Contractor claimed that because of the changes and changed conditions referred to in the first, second, fourth and other causes of action, it fell behind schedule requiring an "acceleration" of its operations which increased its costs resulting in damages. Contractor claimed that during the period December 21, 1965, to April 15, 1966, it expended for stream diversion, dewatering, dam foundation and roadway excavation and winter maintenance $179,752.18 to perform contract item work on which it had bid $54,888. Contractor also claimed a loss of $40,280.82 for idle equipment maintained at the site to do work as permitted by the weather and that it paid $118,026.28 over estimate for premium labor. Contractor also claimed $65,283.23 for double shift instead of single shift operations in placing Zone 1 and Zone 2 material and $9,109.83 for increased cost of Zone 1 and Zone 2 material. Prior to May 25, 1966, Contractor had requested several time extensions which aggregated 129.4 calendar days, but State had allegedly failed to act on the requests within a reasonable time. Engineer did have evidence based on estimates in connection with progress payments to Contractor that by May 20, 1965, Contractor had completed only 1.8 percent of the work but 28 percent of the time had already elapsed; by June 20, 1966, 56.9 percent of the work had been accomplished, but 80.4 percent of the time had elapsed.

State did ultimately recognize that Contractor was entitled to an extension of the completion date by 35 calendar days due to unusually high fire indices which restricted Contractor's ability to burn the material cleared from the reservoir area and delayed the clearing and grubbing of the reservoir area. State ultimately also recognized that Contractor was entitled to an extension of the completion date by 56 calendar days due to increased quantities involved in the construction of the outlet works

and inclined intake (20 days) and increased quantities excavated from the Dam embankment foundation (36 days), which extensions would have put Contractor back on schedule by July 15, 1966. State concluded that after July 15, 1966, Contractor was entitled to a 15-day extension due to the placing of additional quantities of material in the Dam embankment. State recognized, however, that it failed to grant Contractor the foregoing time extensions promptly when requested by Contractor, which failure compelled Contractor to accelerate his operations because of the uncertainty resulting from the failure of State to act promptly on Contractor's request for time extensions. Because of the uncertainty resulting from State's failure to act promptly, Contractor had accelerated its operations because of the $500 per day liquidated damage clause. Engineer concluded that Contractor was entitled to $24,009 for acceleration costs incurred "in overcoming excusable delays in lieu of the time extensions to which Contractor was entitled" for increased quantities involved in the construction of the outlet conduit and quantity overruns in Dam foundation plus $71,569 for acceleration costs incurred as a result of the increased quantities involved in placing the Dam embankment, for a total acceleration allowance of $95,578. Engineer denied the remainder of Contractor's claim for acceleration costs. On review by the Claims Appeal Board, Engineer's decision was affirmed.

The trial court awarded judgment for $219,312.24 with interest in favor of Contractor on this cause of action.

## CONTENTIONS

State makes several contentions,[13] most of which need not be discussed in view of the conclusions which we reach. The one contention made by the State which requires reversal is that the primary issue

---

[13]State's contentions are as follows:

"I  SCOPE OF REVIEW

A. The Parties, By Agreement, Limited the Scope of Judicial Review of the Claims Decision Under Section 5 Article (F) of the Contract

B. The Trial Court Erred in Finding That the Decisions on the Claims by the Deputy Director Were Arbitrary, Capricious, and So Grossly Erroneous as to Imply Bad Faith and Should be Disregarded on Due Process Grounds

C. Under California Law, Even Where the Agreed Claims Decision Involves Interpretation of the Specifications and Plans, Plaintiff Must Prove Not Simply Conflicting Opinions but Fraud or Arbitrary or Capricious Decisions or Gross Error. However, on Appeal From the Judgment of the Trial Court, the Appellate Court is Not Bound by the Interpretation of the Contract by the Trial Court

"II  THE CONTRACT, INCLUDING SECTION 5 OF THE SPECIFICATIONS, MUST BE INTERPRETED ACCORDING TO THE LAW OF THE STATE OF

before the trial court was whether or not there was substantial evidence to support the Engineer's decision, that there was in fact substantial evidence to support the Engineer's decision and, therefore, the trial court

CALIFORNIA AND IN ACCORDANCE WITH THE SPECIFIC TERMS OF THE CONTRACT.

   A. California Statutes and Judicial Decisions Are the Applicable Authority for Interpretation of Section 5 of the Contract Specifications

   B. The Federal Court of Claims' Decisions on Subsurface Conditions are Neither Controlling nor Persuasive

"III. PLAINTIFF DID NOT ESTABLISH THAT THE DECISION OF THE ENGINEER ON THE CLAIM FOR EXCAVATION FOR THE OUTLET CONDUIT PORTION OF BID ITEM 5 WAS GROSSLY ERRONEOUS OR THAT THE SUBSURFACE CONDITIONS ENCOUNTERED DIFFERED MATERIALLY FROM WHAT WAS REPRESENTED. IN ANY EVENT, THE CONTRACTOR WAS PAID ALL IT WAS ENTITLED TO UNDER THE CONTRACT, HAD A CHANGED CONDITION BEEN ENCOUNTERED AND RECOGNIZED AS SUCH

"IV UNDER THE TERMS OF THE CONTRACT PLAINTIFF DID NOT ALLEGE OR PROVE A BREACH OF PROMISE IN RELATION TO REMOVAL OR NONREMOVAL OF ROCK IN THE DAM FOUNDATION. THE CLAIMS DECISION ON THE SECOND CAUSE OF ACTION WAS SUPPORTED BY THE EVIDENCE AND A REASONABLE INTERPRETATION OF THE CONTRACT. IN ANY EVENT, THE FINDINGS OF THE TRIAL COURT WERE CONTRARY TO THE TERMS OF THE CONTRACT AND NOT SUPPORTED BY THE EVIDENCE

   A. Plaintiff Had No Contractual Right to Remove All Protruding or Projecting Rocks

   B. The Complaint Fails to State a Cause of Action Relating to Test Pads and the Findings Relating Thereto Are Contrary to the Provisions of the Contract Specifications and Are Not Supported by Any Substantial Evidence

"V THE FINDINGS AND CONCLUSION OF A CHANGED CONDITION IN THE DESIGNATED QUARRY ARE NOT SUPPORTED BY THE EVIDENCE; AS A MATTER OF LAW, THE SUBSURFACE CONDITIONS IN THE DESIGNATED QUARRY DID NOT DIFFER MATERIALLY FROM WHAT WAS REPRESENTED IN THE CONTRACT

   A. The Facts Do Not Establish a Violation of Section 5(D) in Relation to the Designated Quarry. In Any Event, Plaintiff Did Not Establish That the Decision Under 5(F) On the Quarry Claim Was Arbitrary, Capricious or Grossly Erroneous

   B. Assuming, Arguendo, That Section 5(F) is of No Legal Effect, Finding No. 24 is Not Supported by the Evidence

"VI THE THIRD CAUSE OF ACTION (ACCELERATION) FAILED TO STATE FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION; THE DENIAL OF SAID CLAIM WAS NOT PROVEN TO BE ARBITRARY, CAPRICIOUS, FRAUDULENT OR GROSS ERROR; THE EVIDENCE WAS INSUFFICIENT TO PROVE A BREACH OF CONTRACT; AND THERE WAS A FAILURE TO FIND ON MATERIAL ISSUES

   A. Failure to State a Cause of Action

   B. There Was No Contractual Promise to Pay Money for Time

   C. Even Assuming, Arguendo, a Contractual Promise to Pay for Time That Was Not Granted, There Was a Failure of Proof And Omission of Material Findings to Sustain Any Money Judgment Under the Third Cause of Action

"VII THE DAMAGES AWARDED WERE SPECULATIVE, UNREASONABLE, AND NOT ESTABLISHED TO BE PROXIMATELY CAUSED BY A BREACH OF PROMISE. THE TRIAL COURT ERRED AS A MATTER OF LAW IN

was not required or authorized to try the case de novo. For reasons hereafter stated we agree with State's contentions to that extent. However, we do not agree with State's conclusion based on that premise that the trial court was required to affirm the decision of the Engineer, because Contractor contends[14] that in reaching his decision, Engineer violated Contractor's due process rights. For reasons hereafter stated, we agree with Contractor that Engineer in reaching his decision did violate Contractor's due process rights. However, we do not agree with Contractor's conclusion based on that premise that Engineer's decision was null and void and, therefore, the trial court had the authority and obligation to try the case de novo.

## DISCUSSION

### A. *The Standard of Review*

■ At the threshold we are confronted with the basic question of what standard of review governs this appeal: are we required to affirm

AWARDING INTEREST PRIOR TO THE COMMENCEMENT OF THE ACTION AND ABUSED ITS DISCRETION IN AWARDING PREJUDGMENT INTEREST
A. Damages
B. Interest
"VIII THE FINDINGS OF FACT ARE TOO INDEFINITE AND UNCERTAIN; THERE IS A FAILURE TO FIND ON MATERIAL ISSUES AND THE FINDINGS ARE INSUFFICIENT AS A MATTER OF LAW
A. Applicable Law
B. First Cause of Action—Excavation of Outlet Works Trench
C. Second Cause of Action—Projecting Rocks
D. Third Cause of Action—Acceleration
E. Fourth Cause of Action—Quarry
F. Calculation of Damages"

[14]Contractor's contentions are set forth in its brief as follows: "In this case, there is no question that the State's claims procedures failed to comport with the due process requirements of a full and fair hearing, because: (1) the State only permitted the Contractor to submit its claims in writing and to make an oral presentation at a so-called hearing before the Claims Appeal Board of the State; (2) no evidence or information was given or furnished by the State's representatives at said hearing; (3) the Claims Appeal Board then privately and secretly considered evidence and information supplied by the State's employees outside the presence of the Contractor; (4) the Contractor was not given an opportunity to rebut that evidence or information or even to know what it was because the State never presented its side of the case to the Contractor; (5) that information and evidence was then embodied in a recommendation report [Exhibit A-5] which the Claims Appeal Board made to the Deputy Director, and the Deputy Director based his engineer's decision upon said report; (6) not even that report, nor a report to the Division Engineer prepared by State employees [Exhibit Q-4], were made available to the Contractor (except at a later time during discovery proceedings in the subject lawsuit), and the Contractor was given no opportunity to meet or rebut the information contained in said reports before the engineer's final decision was rendered; and (7) the State did not provide at the trial of this action any record of the so-called hearing before the Claims Appeal Board which would permit effective judicial review."

the judgment of the trial court if there is substantial evidence presented in the de novo trial to support the findings upon which it is based (as respondent Contractor contends), or are we required to reverse the judgment if there was substantial evidence presented to the Engineer which supported his decision (as appellant State contends)?

We are not here confronted with a mandate proceeding under Code of Civil Procedure section 1094.5 for what is commonly called judicial review of an administrative decision. Engineer acquired the power and authority to render a final decision regarding the amount of additional money, if any, that Contractor is entitled to, by virtue of the terms of a voluntary mutual agreement, not by virtue of the provisions of a statute. We are, therefore, here concerned with an ordinary civil action for breach of contract. Consequently, the ultimate issue before the trial court was whether or not State breached its contract with Contractor. Both parties seem to agree that the Engineer's decision was not fraudulent or capricious, as those terms are normally understood, and that the first issue before the trial court was whether or not the Engineer's decision was so grossly erroneous as to *necessarily* imply bad faith. Contractor contends that if it establishes that the Engineer's decision was so grossly erroneous as to necessarily imply bad faith that fact alone establishes that the Engineer was also arbitrary. No useful purpose would be served for us to engage in such an exercise in semantics since the ultimate result would be the same whether Contractor is right or wrong in such contention. The bottom line in either event is whether or not there was substantial evidence to support the Engineer's decision. In the interest of simplicity, therefore, we treat the problem as if it involved only the issue of whether or not there was substantial evidence to support the Engineer's decision or whether it was so grossly erroneous as to *necessarily* imply bad faith.

All of the cited cases, *Clack* v. *State of California* ex rel. *Dept. Pub. Wks.* (1969) 275 Cal.App.2d 743, 747 [80 Cal.Rptr. 274]; *Wiechmann Engineers* v. *State of California* ex rel. *Dept. Pub. Wks.* (1973) 31 Cal.App.3d 741, 748 [107 Cal.Rptr. 529]; *People* ex rel. *Dept. Pub. Wks.* v. *McNamara Corp. Ltd.* (1972) 28 Cal.App.3d 641, 649-650 [104 Cal.Rptr. 822]; *Acoustics, Inc.* v. *Trepte Constr. Co.* (1971) 14 Cal.App.3d 887, 907-909 [92 Cal.Rptr. 723], hold that if the engineer's decision is supported by substantial evidence the trial court cannot set it aside or ignore it, because if it is supported by substantial evidence it is not so grossly erroneous as to necessarily imply bad faith. This rule necessarily

implies that the court is limited to the evidence considered by the contracting officer. No decision can be supported, or shown to be grossly erroneous, by evidence which was not presented in the proceedings out of which the decision arose. Under such circumstances, the trial court cannot try the case de novo and substitute its judgment for the judgment of the Engineer.

In *Wiechmann Engineers* v. *State, etc., supra,* 31 Cal.App.3d 741, the court said (p. 748): "The trial court should not make an independent, de novo determination, for this would deprive the administrative settlement of the degree of finality accorded it by the contracting parties; . . ." (To the same effect, see *Clack* v. *State of California, etc., supra,* 275 Cal.App.2d 743, 749.) That principle is not invalidated (as State claims the trial court concluded) merely because the Engineer in reaching a decision was required to apply legal principles to disputed or undisputed facts, because the contractual provision empowers the Engineer to make an ultimate decision which shall be final and conclusive without limitation as to whether or not in reaching such decision the Engineer is required to apply legal principles to disputed or undisputed facts. In *Clack* v. *State of California, etc.,* the court said (p. 747): "The engineer's decision may entail interpretations of the contract language or specifications; application of a rule of law, . . . or a resolution of disputed facts . . . ." Here the parties mutually agreed that the only limitations on the finality of the Engineer's decision are that it cannot be fraudulent or capricious or arbitrary or so grossly erroneous as to necessarily imply bad faith. The parties, therefore, impliedly mutually agreed, as they were competent to agree, that there should be no other limitation.

*Macomber* v. *State of California* (1967) 250 Cal.App.2d 391 [58 Cal.Rptr. 393], upon which respondent relies, does not support a contrary rule. In that case, a judgment in favor of the contractor was affirmed. The state conceded ". . . that its plans and specifications were incorrect" and relied upon a contract provision making ". . . the decision of the architect in rejecting plaintiff's claim . . . conclusive in the absence of fraud or gross error. . . ." The court recited facts "viewing the record most favorably to the judgment" supporting an inference ". . . from the evidence that this rejection, under the circumstances, at least constituted arbitrary action and failure to exercise honest judgment or, at most bad faith." (Pp. 397, 399.) The court did not specify, however, whether such evidence was original evidence received in the trial, or was the evidence which had been presented to the architect, nor is there any discussion in the opinion of the propriety of conducting a trial de novo and receiving

original evidence. Moreover, the court by making the following statement: "With complete knowledge of the serious errors in the plans and the many subsequent adjustments required of plaintiff, the state architect rejected plaintiff's claim. . . ." suggested that the architect's decision was arbitrary in light of the evidence presented to him. *Macomber* is, therefore, not authority for a trial de novo at which original evidence on the merits of a contractor's claim is received.

Consequently, we conclude that the very learned trial court committed error in trying the case de novo, since the primary issue before it was whether or not the Engineer's decision was supported by substantial evidence.

B. *Substantial Evidence to Support Engineer's Decision*

It is noteworthy that in presenting its case to the trial court Contractor did not even offer in evidence the administrative record upon which Engineer based his decision, or the administrative record upon which the Claims Appeal Board based its recommendation. That administrative record consists of two exhibits (exh. A-5 and exh. Q-4), both of which were offered by State as a part of its defense. Exhibit A-5 consists of two volumes of letter-size material, four inches thick. Exhibit Q-4 consists of two volumes of letter-size material, three inches thick.

We have reviewed the administrative record upon which the Engineer based his decision and the administrative record upon which the Claims Appeal Board based its recommendation and it is manifest that, aside from the question of due process of law hereafter discussed, the Engineer and Claims Appeal Board made a thorough, detailed and complete study and analysis of each of the 27 claims asserted by Contractor, attempted to review all known data within the files of State and all data presented and made available by Contractor and that such data, if not refuted, would constitute a substantial evidentiary basis for such decisions. The differences between Engineer and the Claims Appeal Board, on the one hand, and the trial court, on the other hand, related to matters over which reasonable minds might differ when acting in good faith. The gravamen of all of Contractor's claims (excepting only the claim relating to the quarrying of Zone 3 material from D-quarry) arose out of or were somehow related to the fact that the quantities involved in excavation

and in building the Dam were ultimately greater than either State or Contractor initially expected. This was a unit price contract. Usually greater quantities result in lower unit costs. Whether or not the usual rule was the rule on this project, or whether this project was the exception to the usual rule, or whether or not Contractor's alleged increased costs were due to causes other than an increase in quantities (such as poor management or inept operations or erroneous initial cost or time estimates) were in the final analysis matters of judgment. For example, as Engineer pointed out in the administrative record, while it was true that Contractor had to do more wood forming on the trench for the outlet conduit (for which it was paid extra by a change order) that fact resulted in less hand clean up of the walls of the trench for the outlet conduit. Engineer also had a right to consider as evidence statements by Contractor's personnel that there would be no additional costs above and beyond the unit prices for the various items of work on the outlet conduit, excavation and construction. Engineer also had the right to consider that Contractor had accepted change order 12 and had agreed to accept $23,275 for the extra work in connection with the construction of the outlet conduit and thereby waived any further claim. In fact the $23,275 figure was the precise figure which Contractor initially requested. While it is true that Contractor did more hand compaction of Zone 1 material in the floor of the foundation of the Dam embankment, Contractor was paid unit prices for such additional hand compaction of Zone 1 material, and Contractor did not establish before Engineer that increased quantities resulted in increased costs above and beyond the unit price for hand compacted material.

With reference to the excavation of Zone 3 material from D-quarry, there was substantial evidence upon which the Engineer could and presumably did base his conclusion that the geological conditions in D-quarry were precisely as expected, that Contractor did not excavate more Zone 3 material from D-quarry because it wanted to excavate Zone 3 material from areas where less cost and effort would be required, and that the failure to excavate the quantity of Zone 3 material from D-quarry which was originally contemplated was because of Contractor's dilatory and inept operations and failure to operate in a normally acceptable engineering manner by use of a screening or sorting operation, and that consequently Contractor wasted good rock quarried from D-quarry. Photos 16 and 17 attached to the final geologic report would support a conclusion by Engineer that Contractor never did adequately excavate Zone 3 material from D-quarry so that to this date

nobody can tell with reasonable certainty whether or not Contractor could have removed the necessary Zone 3 material from D-quarry if Contractor had properly excavated D-quarry as State had a right to expect it to do under the terms of the contract. Although Contractor and Engineer had a difference of opinion on these points, clearly it cannot be said that Engineer's opinion was so grossly erroneous as to *necessarily* imply bad faith.

With reference to Contractor's claim for extras for constructing test pads, the Engineer could properly conclude that the construction of test pads on which to test the capability of the Pactor 340 was for Contractor's benefit and convenience and that the cost of constructing such test pads was not a proper charge against State. Certainly such a conclusion was a matter of judgment and was not so grossly erroneous as to necessarily imply bad faith. With reference to Contractor's claim for acceleration costs, Engineer had a right to consider (and the fact constituted substantial evidence) that long before Contractor encountered any problems in connection with increased quantities, Contractor had expended 28 percent of the time and had accomplished only 1.8 percent of the work.

The foregoing is not intended to be an exhaustive treatment of all the evidence in connection with the various claims, but is for illustrative purposes only. The evaluation of these facts and other evidence was a matter of judgment involving discretion for which there were no black or white absolutes, which, of course, is precisely why the parties by contract mutually agreed to accept the expertise of the Engineer rather than the lay opinion of a judge or jury. The reasoning of the Supreme Court in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 148 [93 Cal.Rptr. 234, 481 P.2d 242] is applicable to the case at bar: "The Legislature has delegated to the Commissioner of Corporations extremely broad authority to determine whether any recapitalization is 'in his opinion' 'fair, just and equitable.' Such an administrative decision necessarily involves overwhelming technical knowledge as to matters of corporate structure, finance, taxation, and business judgment. The trial court must defer to the agency judgment in these matters and clearly should not attempt to substitute its judgment for the expertise of the commissioner. Almost any proposed recapitalization may give rise to differences of opinion as to its wisdom and as to whether it might appear fair, just and equitable. The decision to adopt such a plan must derive initially from the sound business judgment of the directors and the required majority of the shareholders. If that corporate decision receives the lawful approval of the Commis-

sioner of Corporations *and his approval enjoys the support of substantial evidence,* that resolution should end the matter." (Italics ours.)

In *Bixby,* the Legislature by statute delegated authority to the Commissioner of Corporations to make decisions on technical matters. In the case at bar, the parties delegated authority *by contract* to the Engineer to make decisions on technical matters. The underlying reasons were the same. The decisions involve technical knowledge, expertise and sound business judgment. The superior court should not substitute its judgment, however learned, for the decision of that expert whose decision the parties have mutually agreed by contract to accept and abide by unless the decision of the designated expert is fraudulent, arbitrary, capricious or so grossly erroneous as to *necessarily* imply bad faith. All of the Engineer's decisions here involve some elements of discretion. The law is well settled that the superior court may not usurp administrative discretion. *(City & County of S. F. v. Superior Court* (1959) 53 Cal.2d 236 [1 Cal.Rptr. 158, 347 P.2d 294].) We conclude that there was substantial evidence to support the Engineer's decision and that the trial court was not required and did not have the authority to try the case de novo.

### C. *Crucial Findings of the Trial Court*
### *Were Not Supported by the Evidence*

A crucial finding of the trial court was finding 10 which reads as follows: "10. In preparing its bid, Pascal & Ludwig *reasonably relied upon the representations* concerning subsurface conditions which were contained in the contract documents and the pre-bid data made available by defendant for bidders use, which representations are more fully identified hereinafter." (Italics ours.)

The representation thereinafter identified is illustrated by finding 12, relating to the conditions in the area of the outlet conduit, as follows: "12. The contract documents and pre-bid data made available by defendant *represented* that moderately weathered rock, or better quality rock, would be encountered at the lines and grades shown on the plans for the excavation of the outlet conduit between Stations 11 + 00 and 16 + 98." (Italics ours.)

Those findings were made in direct contravention of warnings to the bidders that State's statements of quantities were estimates, were

approximate only, being given as the basis for comparison of bids and that State did not agree expressly or by implication that the actual amount of work would correspond with the estimates, and section 2, article (b) of the contract (fn. 3, *supra*) in which the parties mutually agreed to the same effect, and further mutually agreed that the State reserved the right to increase or decrease the amount of work "as may be deemed necessary or advisable by Engineer." Such findings also contravene section 5, article (c)(1) of the contract (fn. 4, *supra*) in which the parties mutually agreed that the quantities stated were estimates only, that actual quantities will vary from estimates *and that such variations were not changes within the scope of the contract.* Those findings were also in direct contravention of section 2, article (c) (fn. 3, *supra*) in which the parties mutually agreed:

"Where investigation of subsurface conditions has been made by the Department in respect to foundation or other design, bidders may inspect the records of the Department as to such investigation, including examination of samples and drill cores, if any. When logs of test borings showing a record of the data obtained by the Department's investigation of subsurface conditions are made available, said *logs represent only the opinion of the Department as to the character of material encountered by it in its test borings and are made available only for the convenience of bidders.*

"Investigations of subsurface conditions are made for the purpose of design, and *the Department assumes no responsibility whatever in respect to the sufficiency or accuracy of borings or of the log of test borings or other preliminary investigations, or of the interpretation thereof, and there is no guarantee, either expressed or implied, that the conditions indicated are representative of those existing throughout the work, or any part of it, or that unforeseen developments may not occur.*

"Making such information available to bidders is not to be construed in any way as a waiver of the provisions of the first paragraph of this Article and bidders must satisfy themselves through their own investigations as to conditions to be encountered.

"No information derived from such inspection of records of preliminary investigations made by the Department or from the Engineer or from his assistants or from the maps, specifications, profiles or drawings will in any way relieve the Contractor from any risk or from properly fulfilling all the terms of the contract. . . ." (Italics ours.)

Certainly those contractual provisions constituted a substantial basis for Engineer's conclusion that an increase in quantities alone was not, in and of itself, sufficient to entitle Contractor to greater payment than the unit prices which had been agreed upon multiplied by the actual number of units as established by actual performance in the field. It certainly cannot be said that such a conclusion by Engineer was so grossly erroneous as to *necessarily* imply bad faith.

This controversy compels us to point out the obvious: we are not here concerned with simple error; we are concerned only with the question of whether there was error which was so gross as to *necessarily* imply bad faith. The following statement in *Acoustics, Inc.* v. *Trepte Constr. Co., supra,* 14 Cal.App.3d 887 is applicable (p. 909): "Here, there is nothing in the record to show actual fraud, constructive fraud, bad faith or dishonest judgment on the part of the State Architect. *Nor is there a showing of gross error on the theory that his decision was arbitrary, since such decision is supported by substantial evidence in the record.* There was an abundance of testimony in the record by expert witnesses, well qualified in their field, to the effect that under the plans and specifications, the layout of the ceiling and provision of support for the lighting fixtures were part of the general work contracted for by Trepte, and under the contract Trepte, and therefore its subcontractor Acoustics, were obligated to do the layout and furnish the support for the lighting fixtures without the right to claim and receive extra compensation therefor. *In this state of the record, the trial court's finding that the State committed gross error in interpreting the contract and the plans and specifications incorporated therein is not supported by substantial evidence.*" (Italics ours.)

### D. *Contractor's Due Process Rights*

At this point we would normally reverse the judgment of the trial court with instructions to enter judgment in favor of Contractor in the sum of $127,297.68, the amount awarded Contractor by Alfred R. Golzé, Deputy Director State Water Project, on the recommendation of the Claims Appeal Board, but Contractor raises an additional point which requires further consideration.

As noted in footnote 14, *supra,* Contractor contends that in reaching his ultimate decision Engineer violated Contractor's due process rights, since Contractor was never advised of the factual basis of the Engineer's decision prior to the rendition thereof and consequently

Contractor was not afforded an opportunity to refute or supplement the factual basis for Engineer's decision. Contractor relies, inter alia, on *People* ex rel. *Dept. Pub. Wks.* v. *McNamara Corp. Ltd., supra,* 28 Cal.App.3d 641. In *McNamara,* contractor sought to discover certain state files which engineer had relied upon in reaching his decision and which contractor had been denied the right to see. State there claimed that the state file was confidential. The trial court denied contractor's motion for production of the file. The appellate court reversed, stating (p. 650): "However, one procedural error, in violation of fundamental due process of law, has been committed in the submission of claims to the state engineer. The board of review, upon whose recommendations the engineer acted, had before it the state's claims file; but both then and now the contractor has been denied access to such file, upon a contention of privileged official information."

The court then referred to Evidence Code section 1040 relating to the confidentiality of government records and stated (p. 651):

"The statutory language suggests a narrow application of the official information privilege in contentious matters, up to the point where the attorney-client privilege would apply to pending or prospective litigation. In any event, however, when the state has submitted certain data to any officer performing an adjudicatory function, as was the state engineer in this instance, then the state 'has consented that the information be disclosed in the proceeding' within the meaning of section 1040. *Thereupon and thereafter, such data was required to be made available to the contractor.*

' "Certain principles have remained relatively immutable in our jurisprudence. *One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."* ' (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 172 [65 Cal.Rptr. 297, 436 P.2d 297], quoting *Greene* v. *McElroy* (1959) 360 U.S. 474, 507 [3 L.Ed.2d 1377, 1396-1397, 79 S.Ct. 1400].)" (Italics ours.)

Contractor relies, inter alia, on *United States* v. *Bianchi & Co.* (1963) 373 U.S. 709 [10 L.Ed.2d 652, 83 S.Ct. 1409]. The *Bianchi* case involved a contract with the federal government to which the "Wunderlich Act," 41

United States Code section 321 et seq.[15] applied. The United States Supreme Court in referring to the congressional background of the Wunderlich Act said (pp. 716, 717 [10 L.Ed.2d pp. 658-659]):

"The House Report recommending the bill ultimately enacted leaves little doubt that the review intended was one confined to the administrative record. H. R. Rep. No. 1380, 83d Cong., 2d Sess. The explicit references to the Administrative Procedure Act, 60 Stat. 243, 5 U.S.C. § 1009, and to this Court's discussion of the standards of review in *Consolidated Edison Co.* v. *Labor Board,* 305 U.S. 197, 229, are only the least indications. Even more significant is the Committee's view, echoing that of the witness quoted above, that the standards proposed would remedy the practice in many departments of failing to acquaint the contractor with the evidence in support of the Government's position:

" 'It is believed that if the standard of substantial evidence is adopted this condition will be corrected and that the records of hearing officers will hereafter contain all of the testimony and evidence upon which they have relied in making their decisions. *It would not be possible to justify the retention of the finality clauses in Government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal.*' H. R. Rep. No. 1380, 83d Cong., 2d Sess. 5.

"This sound and clearly expressed purpose would be frustrated if either side were free to withhold evidence at the administrative level and then to introduce it in a judicial proceeding. Moreover, the consequence of such a procedure would in many instances be a needless duplication of evidentiary hearings and a heavy additional burden in the time and expense required to bring litigation to an end. . . . " (Italics ours.)

In the case at bar the contract (§ 5, art. (f); fn. 7, *supra*) does not require the Engineer to conduct an adversary hearing with a reporter's transcript and all of the other procedural niceties of a trial in the superior

---

[15] 41 United States Code section 321 provides: "No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

court. The contract merely requires Engineer to reach a decision which is not fraudulent, or arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith, However, it is settled law that:

" . . . There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract. [Citations.] This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, *but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.* [Citations.]" (Italics ours.) (*Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367]; see also Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 576, p. 493.) In our view that implied covenant must of necessity encompass an implicit promise that in reaching his decision Engineer will do so without violating Contractor's due process rights.

Contractor is entitled to due process which as an absolute minimum requires an opportunity to show that matters upon which Engineer relies or intends to rely are untrue. The principles enunciated in *McNamara, supra,* require Engineer *to advise Contractor in advance of Engineer's decision of the factual record upon which he intends to rely in reaching a decision so that Contractor may within a reasonable period refute or supplement any of such factual material if it desires to do so.* Obviously the same rights should be accorded State inasmuch as Engineer, even though a state employee, when making a decision acts in a quasi judicial capacity.

Engineer in reaching his decision did commit a procedural error of due process magnitude by failing to advise Contractor in advance of the factual material upon which Engineer intended to rely and by failing to give Contractor a reasonable opportunity to refute or supplement any of such factual material.

### E. *The Remedy*

It does not follow from this conclusion, as Contractor contends, that the trial court had the authority or obligation to try the case de novo. As noted Contractor relies on *Bianchi, supra.* However, *Bianchi* does not support Contractor's conclusion that when the Engineer in reaching a decision violates Contractor's due process rights, the Engineer's decision is automatically null and void, the trial court has the right to try the case

de novo, and an appellate court has no choice but to affirm the judgment of the trial court if that judgment is supported by substantial evidence. There is another alternative: the trial court can refer the matter back to the Engineer for reconsideration and decision after the Engineer has satisfied Contractor's due process rights, which is in effect what the United States Supreme Court concluded should be done in *Bianchi.*

We are not unmindful of the fact, as already stated, that this is a civil action for damages for breach of contract, but notwithstanding that fact, it is a civil action in a court of general jurisdiction possessed of general powers including equitable powers. As a court of general jurisdiction, possessed of equitable powers, the trial court had the authority to order the Engineer to reconsider Contractor's claim but to do so only after satisfying Contractor's due process rights, and the court had the power to make such order notwithstanding the fact that it was not the precise form of relief which either party sought. In *Sears* v. *Rule* (1945) 27 Cal.2d 131, 149 [163 P.2d 443] the court said: " . . . a court of equity, having once acquired jurisdiction, will adjust all the differences between the parties arising from the cause of action in order to do complete justice and prevent further litigation, whether or not the particular relief was requested. (See *Smith* v. *Blodget,* 187 Cal. 235, 242 [201 P. 584]; *Vierra* v. *Fontes,* 135 Cal. 126, 129 [66 P. 241]; *Murphy* v. *Sheftel,* 121 Cal.App. 533, 541 [9 P.2d 568].) It has been held that under this rule the court could properly order an accounting although the complaint did not ask for such relief. [Citations.]"

Paragraph XV of the prayer of the complaint sought "such other and further relief as the Court deems just." Paragraph XXXXIII of Contractor's complaint (which was incorporated by reference in each of the four causes of action) alleged:

## "XXXXIII

"The Deputy Director of the State Water Project referred the matter to an Appeals Board of three members, who heard testimony from the plaintiff; the Appeals Board then took evidence outside of the presence of the plaintiff and from persons whom the plaintiff did not have any opportunity to cross-examine or rebutt, [*sic*] as the plaintiff was not advised of the evidence which the Appeals Board took outside of the presence of the plaintiff."

Paragraph XXXXIII demonstrates that the denial by Engineer of Contractor's due process rights was clearly within the issues framed by the pleadings. The form of relief hereinafter provided by our judgment is clearly appropriate for the protection of Contractor's due process rights and it is within the power of the trial court. It is consistent with the form of relief granted by the federal courts where an administrative decision has been reached after denial of due process rights (*United States* v. *Bianchi & Co., supra*; *United States* v. *Bradt* (C.D.Cal. 1968) 291 F.Supp. 1022), and which California courts have granted in similar cases in proceedings under Code of Civil Procedure section 1094.5. (*Wood* v. *City Civil Service Commission* (1975) 45 Cal.App.3d 105 [119 Cal.Rptr. 175]; *English* v. *City of Long Beach* (1950) 35 Cal.2d 155 [217 P.2d 22, 18 A.L.R.2d 547]; *Mahoney* v. *San Francisco City etc. Employees' Ret. Bd.* (1973) 30 Cal.App.3d 1, 6 [106 Cal.Rptr. 94].)

In *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 268 [246 P.2d 656] the court said: " . . . it is settled that where determinative powers are vested in a local administrative agency and the court finds its decision lacks evidentiary basis, a hearing was denied or it was otherwise erroneous, it is proper procedure to remand the matter to the agency for further and proper proceedings rather than for the court to decide the matter on the merits. [Citations.]"

At oral argument, Contractor argued that *Fascination, Inc.* v. *Hoover* was overruled by *Strumsky* v. *San Diego County Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], and that since *Strumsky*, Contractor is entitled to a "de novo" trial in the superior court. The argument is untenable. In *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768 [122 Cal.Rptr. 543, 537 P.2d 375] (decided one year after *Strumsky*), the court said (p. 776): "The holding of *Saks & Co.* [*Saks & Co.* v. *City of Beverly Hills* (1951) 107 Cal.App.2d 260 (237 P.2d 32)] that allegations of arbitrary agency action compel a trial de novo in the superior court was rejected, and the decision itself overruled, in *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 264-266 [246 P.2d 656]. Commercial seeks to distinguish *Fascination* on the ground that the plaintiff in *Fascination* did not predicate its allegations of arbitrary action on alleged agency denial of a fair hearing. But whatever questions may remain after that decision, the issue has been clarified in later cases. Commercial is entitled to an *independent* judicial determination of the issue of whether it received a fair administrative hearing. (See *Western Air Lines, Inc.* v. *Schutzbank* (1968) 258 Cal.App.2d 218, 226 [66 Cal.Rptr. 293]; Cal. Administrative Mandamus (Cont. Ed. Bar 1974 Supp.) § 5.9; cf. *Bekiaris* v. *Board of*

*Education* (1972) 6 Cal.3d 575, 587 [100 Cal.Rptr. 16, 493 P.2d 480].) *But this independent review is not a 'trial de novo' as Commercial uses that term; instead the court renders its independent judgment on the basis of the administrative record plus such additional evidence admitted under section 1094.5, subdivision (d)."* (Italics ours; fn. omitted.)

Since the authority of the Engineer to make a final decision is derived from contract, we analogize the procedural problem in the case at bar to the decision by a labor union official or committee expelling a union member without a fair hearing and the union member thereafter seeks judicial relief. In *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 147 [231 P.2d 6, 21 A.L.R.2d 1387], where the trial court ordered the union to reinstate the expelled member because he had been denied a fair hearing, the court said (p. 147): "The trial court properly refused to pass on the truth of the charges against plaintiff, but it nevertheless ordered issuance of a writ of mandate directing defendants to set aside the suspension and expulsion and to restore and reinstate plaintiff as a member of the union. This judgment is too broad since it appears that the imposition of such a penalty by the union after a fairly conducted hearing may be justified on the basis of the charges of insubordination. *The matter should therefore be remanded to the union for further proceedings* in accordance with the rules which we have discussed. [Citations.]" (Italics ours.)

In *Bush* v. *International Alliance* (1942) 55 Cal.App.2d 357 [130 P.2d 788], a union member, who had been expelled from the union after a union trial, filed a mandate proceeding seeking reinstatement in the union alleging that the alleged offense for which he had been expelled was barred by the statute of limitations; he had been denied notice of trial and an opportunity to defend himself; and the union had used hearsay evidence to convict him. The trial court ordered the union to reinstate the petitioner. The appellate court, examining such claim and holding that the union constitution and bylaws had been complied with, reversed the judgment of the trial court, stating (p. 363):

"The rule to be here applied is set forth in *Hugh McConville* v. *Milk Wagon Drivers' Union, Local No. 226, of San Francisco, California, et al.,* 106 Cal.App. 696 [289 P. 852] at page 698:

" 'Furthermore it is held generally that with respect to the merits of the charges which have resulted in suspension or expulsion of the member

the province of the court is restricted to the ascertainment of whether there was any evidence whatever before the union to support its conclusion, and that it may not consider the weight of such evidence nor substitute its judgment thereon for the judgment of the tribunal before whom the member was tried. (*Martin's Modern Law of Labor Unions,* p. 393; *Fritz* v. *Knaub,* 57 Misc. Rep. 405, (103 N.Y.Supp. 1003)).'

"The foregoing evidence satisfies all the contractual requirements as between petitioner and the union, in accordance with the rule in such cases as this which we must follow. (*Dingwall* v. *Amalgamated Assn.,* 4 Cal.App. 565 [88 P. 597].)"

In *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440 [120 P.2d 79], the plaintiffs sued the American Federation of Labor for an injunction compelling it to reinstate the charter of the Central Labor Council of Santa Clara County which had allegedly been revoked by the American Federation of Labor without notice or a hearing. The trial court refused injunctive relief. The appellate court reversed, saying that plaintiffs were entitled to notice and hearing even though the constitution and rules of the American Federation "made no provision therefor" (p. 440). The court in effect held that the trial court should have required the American Federation of Labor to reconsider its decision after giving the Central Labor Council notice and a right to be heard. The court said (p. 445): "This court will not undertake to inquire at this time whether the Central Labor Council committed any breach of its obligations to the American Federation of Labor or was guilty of any conduct which would justify the suspension or revocation of its charter after proper notice and a hearing. The very purpose of such hearing would be to determine those facts. *Having determined that its charter may not legally be suspended or revoked without a hearing, it would be improper to substitute a hearing in this or the trial court for the hearing that the Central Council is entitled to have within the federation to which it belongs.*" (Italics ours.)

The same principles apply to other forms of associations founded on voluntary contract. (*Smith* v. *Kern County Medical Assn.* (1942) 19 Cal.2d 263 [120 P.2d 874]; *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 485 [131 Cal.Rptr. 90, 551 P.2d 410].)

We paraphrase the language of the court in *English* v. *City of Long Beach, supra:* "The fact that the [Engineer] has heard and decided the matter does not preclude another hearing even though the [contract]

does not provide for a rehearing, and the [Engineer] cannot be said to have exhausted [his] power to act until [he] has given [Contractor] a fair hearing." (35 Cal.2d 155 at p. 160.)

*Macomber* v. *State of California, supra,* lends no support to any different conclusion. As above pointed out, it involved a situation in which the evidence presented to the architect lent no substantial support to his determination, and in no way dealt with the problem here involved; that is, where evidence amply supports the contracting officer's determination, but due process was denied by the lack of any opportunity on the part of the Contractor to meet and controvert such evidence.

■ We conclude from the foregoing authorities that where parties, by voluntary contract, have mutually agreed that disputes between them shall be settled by the decision of a designated person or persons, whom for the sake of brevity we will call an arbiter,[16] and a party to such contract claims that in reaching such decision the arbiter has violated his due process rights and he seeks judicial relief, the proper form of judicial relief is an order by the trial court to the arbiter to reconsider the decision after satisfying the aggrieved parties' due process rights.

Without such a referral to the Engineer for reconsideration after a fair hearing, the trial court or this court would be compelled to guess at what the Engineer's decision would be after the Engineer satisfied Contractor's due process rights. Such a guess might well be a further denial of Contractor's due process right, or even of State's due process right, to a decision as provided by the contract.

The judgment is reversed with directions to the trial court to enter judgment in favor of Contractor with costs, directing the Engineer of the State or his designated representative to reconsider the four claims of Contractor embodied in the first four causes of action involved in this appeal after, but only after, said Engineer or his designated representative has fully advised Contractor and State, in writing in advance, of the testimony, oral statements and documentary evidence upon which Engineer, or his designated representative, intends to rely in reaching his decision; and thereafter to afford Contractor and State a reasonable opportunity to refute or supplement such testimony, oral statements and

---

[16]As here used, the term arbiter is not to be confused with a technical arbitration agreement as provided by statute. (Code Civ. Proc., §§ 1280-1293.)

documentary evidence if Contractor or State desires to do so. The judgment in favor of State insofar as it relates to causes of action V through XII is affirmed. Each party to bear its own costs on appeal.

Ford, P. J., and Potter, J., concurred.

A petition for a rehearing was denied June 7, 1977, and the opinion and judgment were modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 21, 1977.